No. 1,088.

KINGAN & COMPANY, LIMITED, *v.* SILVERS ET AL.

ALTERATION OF INSTRUMENT.—*Note.*—*Alteration by Stranger, by Servant of Payee.*—*Spoliation.*—*Recovery.*—A being a traveling salesman for B, but not a general agent, and having no authority to make settlements or take notes on B's accounts, was instructed by B to procure for him, from C, a note on account of an indebted-

Kingan & Company, Limited, *v.* Silvers *et al.*

ness due from C to B, and having procured the note, and while he was in the process of conveying the same to B, and without the authority, knowledge or consent of either B or C, A altered the note by striking out the words *"after maturity"* and inserting the words *"from date,"* so as to make the note read " with eight (8) per cent. interest from date."

*Held,* that, although alteration was a material one, A when he made the alteration of the note stood in the relation to it of a stranger, and as servant to the payee, and that his act was a mere spoliation.

*Held,* also, that B, not having ratified the act of A, could enforce the note in its original form.

SAME.—*Agent.—Servant.*—While A was engaged in treating with C, concerning the note, he was an agent ; when the note was delivered to him, it was in law delivered to B, and A ceased to deal with C, and was no longer an agent; all of A's duties concerning the note then related to B, in carrying and delivering it to him, and he was a mere servant of B.

SAME.—*Prevailing Rules as To.*—For prevailing rules in relation to alteration of instruments, see opinion, p. 85.

MASTER AND SERVANT.—*Distinction Between Servant and Agent.*— There is a legal distinction between agent and servant. Agency, in its legal sense, always imports commercial dealings between two parties by and through the medium of another, and the agent negotiates and treats with third parties in commercial matters for another. A servant is concerned with matters of manual and mechanical execution, while an agent is the more direct representative of the master or principal, and clothed with higher powers and broader discretion than a servant.

PUBLIC POLICY.—*Defense.*—The doctrine of public policy can only be invoked to prevent and not to perpetuate a fraud.

DAVIS, C. J., and GAVIN, J., dissent.

From the Marion Circuit Court.

*L. B. Swift,* for appellants.

*T. J. Terhune,* for appellees.

LOTZ, J.—The appellant was the plaintiff and the appellees the defendants in the court below. The complaint is in one paragraph, and alleges that on September 25, 1888, the defendants, at Lebanon, Indiana, executed to the plaintiff the following note :

VOL 13—6

"$388.03. LEBANON, IND., Sept. 25, 1888.

"Ninety days after date, we promise to pay to the order of Kingan & Co., at the Meridian National Bank of Indianapolis, Ind., three hundred and eighty-eight and 03-100 dollars, with eight per cent. interest after maturity until paid, and five (5) per cent. attorney's fees. Value received, without any relief from valuation or appraisement laws. And it is hereby understood that the drawers and endorsers severally waive presentment for payment, of protest and non-payment of this note.

"W. F. SILVER,

"Due 24th Dec., 1888. "JAMES SILVER.."

The complaint further alleges that the note was procured from defendants by the plaintiff's traveling salesman, one W. H. Nichols; that said salesman was not a general agent, and had no general authority to make settlements or take notes on plaintiff's account, nor was that a part of his duties; that, being about to go to Lebanon, in the course of his duties as such traveling salesman, the plaintiff instructed him to procure for plaintiff from defendants a note on account of an indebtedness to plaintiff amounting to $388.03; that this agent accordingly procured the note sued upon; that after the execution of the note, the agent took it to another part of Lebanon, entirely away from and out of communication with defendants, or either of them, and there, while he was in the process of conveying the note to plaintiff, and without the authority or knowledge or consent of the plaintiff or of the defendants, or either of them he altered the note by striking out the words "after maturity," and inserting the words "from date," so as to make the note read, "with eight (8) per cent. interest from date;" that the agent then transmitted the note to plaintiff, but did not inform plaintiff of the alteration, nor did plaintiff have any knowledge of it

until after the note became due and was sent to Lebanon for collection; that the plaintiff has never in any way ratified or approved the agent's act in changing said note, but since learning of the same has only demanded and now only demands payment of the note as originally executed; that the agent believed that he had the right to make the alteration; that the note was written on a printed blank, and that, in commerce, it is the constant practice, if the instrument is to bear interest from date, to make a change exactly similar to this change, and that there was nothing in the appearance of the note to put plaintiff upon inquiry.

The defendants separately demurred to the complaint for want of sufficient facts. The demurrers were sustained, to which ruling the plaintiff excepted, and electing to abide by its complaint final judgment on demurrer was rendered for the defendants.

The errors assigned are the rulings of the court in sustaining the separate demurrers to the complaint.

According to the allegations of the complaint, the note as originally executed, provided for "eight per cent. interest after maturity until paid." It was altered or changed by striking out the words "after maturity" and the words "from date" inserted, so as to make it read "with eight per cent. interest from date." This was a material alteration and so changed the terms of the note as to increase the obligations of the makers. A contract is an agreement and promise enforceable by law. In every express contract the minds of the contracting parties must come to and consent to the same stipulations and conditions. Such a contract rests primarily in mental processes, which are invisible and intangible. The parties may, at their option, put the terms of the contract in writing, and cause the same to be signed by the persons to be charged thereby. The

writing then becomes the deed or act of the parties who sign the same. Owing to the fixed methods of procedure in courts of justice and the illiberal rules of evidence that formally existed, the importance of preserving written instruments in their original integrity, was much greater than in more recent times.

Custom required that the acts which marked the completion of certain kinds of contracts should be attended with great solemnity and formality. The purpose was to preserve and perpetuate the evidence of the contract. In the execution of certain written instruments the formal requirements become of as much importance as the contract itself. Holmes Com. L. 261. A written instrument in the hands of an adverse party is easily susceptible of alteration, to the injury of the maker. Many written contracts are negotiable and perform important functions in commercial transactions. It is of the highest importance to the commercial world, that they be preserved in their original state or condition. Public policy demands this for the prevention of frauds, and of loss to innocent persons. The most effectual means of preserving the integrity of such instruments is the rule that a material alteration destroys the instrument so that no recovery can be had upon it, either in its original or altered condition; and the rule that no recovery can be had upon the original consideration, if the change be made for a fraudulent purpose. The object of these rules is to enjoin the highest care upon the holder and to punish him with loss for his negligent or fraudulent conduct.

One of the early decisions of the English courts on the subject of the alteration of written instruments is that of Pigot's case, decided by Sir Edward Coke, in the year 1614. Coke's Rep., vol. 6, part. XI., p. 27.

It was then resolved, "That when any deed is altered in a point material, by the plaintiff himself, or by any stranger, without the privity of the obligee, be it by interlineation, addition, erasing, or by drawing of a pen through a line, or through the midst of any material word, that the deed thereby becomes void. \* \* \* \* So if the obligee himself alters the deed by any of the said ways, although it is in words not material, yet the deed is void : but if a stranger, without his privity, alters the deed by any of the said ways in any point not material, it shall not avoid the deed."

Since the time of Pigot's case we find in the books a multitude of adjudications bearing upon the subject of the alteration of notes and other written instruments. They are not all consistent nor easily reconciled. But after all that has been said, each case must stand much more on its own facts than upon the rules announced in any given case.

The rules announced in Pigot's case have been modified in England ; and they never did prevail in America to their full extent or in their original vigor. The rules that now prevail as we gather them from the decided cases are, (1) that the alteration of a note or written instrument in a material matter by a stranger, is but a spoliation and does not destroy it, and a recovery may be had on it in its original condition. (2) If the plaintiff, the obligee or the holder, make an alteration in an immaterial matter, the alteration does not destroy the note, but a recovery may be had on it in its original condition. (3) But if the alteration be in a material matter and be purposely or intentionally made by the plaintiff, the obligee or the holder, such alteration destroys the note or instrument, and no recovery can be had upon it in either its original or altered condition.

The last rule is the same as one of the rules laid down by Lord Coke in Pigot's case, and is still the law.

If the case at bar falls within this latter rule, then the demurrers were correctly sustained. The change in the note was not made by the plaintiff's order or direction, but it entrusted certain business to another as its agent and such person made the alteration. If the alteration was made by the agent while in the transaction of the principal's business and in the scope of his authority, then the act of the agent is the act of the principal. *Qui facit per alium facit per se.* The solution of this case depends upon the relation existing between Nichols and the plaintiff, at the time the alteration was made. If he was the plaintiff's agent, and the act was within the scope of his authority, then his act must be deemed the act of the plaintiff and the law is with the defendants. If his position was that of a mere stranger to the note, then the law is with the plaintiff.

The appellees rely confidently upon the case of *Eckert* v. *Louis*, 84 Ind. 99, as furnishing a rule binding upon this court and as decisive of the question here involved. The facts of that case briefly are, that a note had been signed by a principal and his surety, and was by the principal delivered to the agent of the payees. In a short time after the delivery the note was altered in a material respect by the person to whom it had been delivered. Such change was made in the presence of the principal and with his consent. But the change was without the knowledge or consent of the surety. Suit was instituted against the surety alone on the note in its altered condition. The court held that there could be no recovery in such an action against the surety. It seems to us that the bare statement of the facts shows the correctness of the holding. The note was changed in a material respect, and yet the effort was to enforce

it in its altered condition. The position occupied by the person making the change was wholly immaterial to the decision of that case. If he was a stranger to the note and his act a spoliation, the note could not be enforced against the surety in its altered condition. Neither could the payees enforce the note in its altered condition if the person making the change was their agent. There could be no recovery upon the note in its altered condition. What is said in that case on the subject of agency is foreign to the point in judgment and cannot be deemed authority. Even if it be conceded that what is said in that case upon the subject of agency correctly states the law as to the facts of that case, still the facts there are very different from this case. There the agent was instructed and directed by the principal to collect the money or obtain undoubted security and not to leave until he had done so. In making the change the agent's "sole effort and desire were to obey strictly the orders of the plaintiff (the payees) which were * * * to collect their debt, or procure * * undoubted security." The alteration was made in the presence of the principal debtor and with his knowledge and consent. In making the change the agent was acting with a third party in commercial dealings. The payees sought to enforce the note in its altered condition. In so doing they accepted and ratified the action of their agent and made his act their own act. Under such circumstances it was unimportant whether the agent was acting within his authority or not at the time of the alteration. The subsequent ratification made his act the act of the payees. Here the effort is not to enforce the note in its altered condition, but in its original state. Again the case to which we have alluded differs from this in another respect. That was an action against a surety and a surety is a favorite of the law.

The appellees further insist that Nichols was the agent of the payee in making the alteration;that he was acting in the line of his agency and under color of his employment ; that his wrongful act is imputable to his principal. In support of this position appellees' learned counsel say : "This is upon the legal maxim 'whatever a man *sui juris* may do of himself he may do by another,' and, as a correlative, whatever is done by such other in the course of his employment is deemed to be done by the party himself. On this principle the liability of one person for the acts of another who is employed in the capacity of an agent is extended to the wrongful and tortious acts of the latter committed in the line and under color of the agency, although such unlawful acts were not contemplated by the employment, and were done by the agent in good faith and by mistake. In other words, where a principal directs an act to be done by an agent, in a lawful manner, but the agent errs in the mode of executing his authority to the prejudice of another person,the principal will be held responsible." This is a correct statement of the law. The same principles extend to the relations existing between a master and his servant. Thus if the engineer of a railway company negligently run a train of cars over a person who is without fault, the company is liable for the injury caused. The same doctrine is applied to the willful acts, and the mistakes of agents and servants, committed by them while acting within the scope of the agency or line of the employment. *May* v. *Bliss*, 22 Vt. 477 ; *Luttrell* v. *Hazen*, 3 Sneed (Tenn.) 20 ; *Pennsylvania Co.* v. *Weddle*, 100 Ind. 138 ; *Evansville, etc., R. R. Co.* v. *McKee*, 99 Ind. 519 ; *Crockett* v. *Calvert*, 8 Ind. 127.

At the time Nichols made the alteration of the note, was he the agent or servant of the plaintiff in respect to

Kingan & Company, Limited, *v.* Silvers *et al.*

his duties pertaining to said note? It is averred that he was the traveling salesman, but that he was not a general agent, and had no authority to make settlements or take notes on plaintiff's accounts; nor was that any part of his duties; that being about to go to Lebanon in the course of his duties as such traveling salesman, the plaintiff instructed him to procure for plaintiff from the defendants a note on account of an indebtedness due from them to the plaintiff. But the averments of the complaint negativing the fact of agency will not control if it appear from all the averments that the legal relation of agency exists. The same person may be a special agent for the same principal in several different matters. Nichols was the agent of the plaintiff to sell goods. He was also its agent to procure the note. We are here concerned with the latter agency only. Did his relation as agent cease when he obtained the note or did it continue until the note was delivered to the plaintiff? If the agency ceased when the note was obtained by him, what relation did he sustain to the plaintiff in the interval of time between the delivery to him and the delivery to plaintiff? This leads to the inquiry: "Who are agents and who are servants?" In the primitive conditions of society the things which were the subjects of sale and trade were few in number. There was little occasion for any one to engage in commercial transactions, and when it did become necessary the business was generally transacted by the parties thereto in person. But the strong and powerful had many servants who were usually slaves. The servants performed menial and manual services for the master. As civilization advanced the things which are the subjects of commerce increased, and it became necessary to perform commercial transactions through the medium of other persons. The

relation of principal and agent is but an outgrowth or expansion of the relation of master and servant. The same rules that apply to the one generally apply to the other. There is a marked similarity in the legal consequences flowing from the two relations. It is often difficult to distinguish the difference between an agent and a servant. This difficulty is increased by the fact that the same individual often combines in his own person the functions of both agent and servant. Agents are often denominated servants and servants are often called agents. The word "servant" in its broadest meaning includes an agent. There is, however, in legal contemplation a difference between an agent and a servant. The Romans, to whom we are indebted for many of the principles of agency, in the early stages of their laws used the terms *mandatum* (to put into one's hand or confide to the discretion of another) and *negotium* (to transact business or to treat concerning purchases) in describing this relation. Story Agency, section 4. Agency, properly speaking, relates to commercial or business transactions, while service has reference to actions upon or concerning things. Service deals with matters of manual or mechanical execution. An agent is the more direct representative of the master and clothed with higher powers and broader discretion than a servant. Meacham Agency, sections 1 and 2.

The terms "agent" and "servant" are so frequently used interchangeably in the adjudications that the reader is apt to conclude they mean the same thing. We think, however, that the history of the law bearing on this subject, shows that there is a difference between them. Agency in its legal sense always imports commercial dealings between two parties by and through the medium of another. An agent negotiates or treats with third parties in commercial matters for another.

When Nichols was engaged in treating with the defendants concerning the note he was an agent. When the note was delivered to him it was in law delivered to the plaintiff and he ceased to treat or deal with the defendants. All his duties concerning the note then related to the plaintiff. It was his duty to carry and deliver it to the plaintiff. In doing this he owed no duty to the defendants. He ceased to be an agent be-. cause he was not required to deal further with third parties. He was then a mere servant of the plaintiff charged with the duty of faithfully carrying and delivering the note to his master. When Nichols made the alteration in the note he was the servant and not the agent of the plaintiff. Appellees,learned counsel further contend, that if it be true that the master is liable for the wrongful and tortious acts of his servant it can make but little difference whether Nichols was agent or servant when he made the change. Upon what principle is the master liable for the wrongful acts of his servant? This inquiry carries us back to the very dawn of jurisprudence. The modern idea of law is that it consists of those rules of conduct prescribed and enforced by the sovereign power of the State. But as Mr. Justice Stephen truly remarks: "It is not till a very late stage of its history that law is regarded as a series of commands issued by the sovereign power of the State." As a matter of historical fact ancient laws were not commands. They were not issued by political superiors, nor were they enforced by punishment or otherwise. "They were merely customs sanctioned by usage voluntarily observed with that strong devotion to usage which always characterizes uncivilized nations." Vengeance on the part of the person injured is the foundation of all legal redress. The early history of all political societies shows the same system of private revenge and

personal redress of injuries. Each person avenged in whatever manner he deemed right the injuries done him. The tribal customs not only sanctioned his doing so, but perhaps required him to do so. If he failed to avenge an injury or wrong he was brought under the ban of public contumely. The spirit of retaliation is deeply rooted in human nature. Retribution in kind is the first impulse of the savage mind on sustaining an injury. "An eye for an eye, a tooth for a tooth; who so sheddeth man's blood by man shall his blood be shed— was the rule of all early and savage communities." If one man killed another, custom permitted and perhaps required that the blood relatives of the deceased should avenge his death by killing the slayer. The Romans were the most civilized of all the ancient peoples. Their laws form the basis of all modern jurisprudence. Yet Mr. Mayle, in speaking of Roman law, well says: "A system of self-redress in the form of private vengeance preceded everywhere the establishment of a regular judicature; the injured person, with his kinsmen, or dependents, made a foray against the wrong doer, and swept away his cattle and with them perhaps his wife and children, or he threatened him with supernatural penalties by "fasting" upon him as in the East even at the present day; or finally be reduced his adversary to servitude or took his life." Mayle's Just. Inst. vol. 1, p. 614. The family or tribe of the person who had committed an offense might escape the vengeance of their adversaries by delivering up or surrendering the offending member. As society slowly and gradually emerged from this depth of barbarism, a custom arose by which the person who inflicted the injury might buy off the vengeance of the injured. If the parties could not agree on the amount to be paid the tribal assembly fixed it. These tribal assemblies met for the purpose of fixing

the price of vengeance are the prototypes of modern courts. The idea that society or the State was injured by a wrong inflicted upon one of its members or upon his property was of much later growth. If a man's slave inflicted an injury upon another the injured party was entitled to wreak his vengeance upon the immediate cause of the injury. This same principle extended to animals and inanimate objects. But the master or owner might buy off the vengeance of the injured person by a money consideration and thereby save the life of his slave or injury to his property. This digression into the history of law may seem inappropriate to the decision of this case. But a knowledge of the history of that branch of law with which any principle is connected, is often necessary before the true bearings and the limits of its application can be fully determined. Principles which have originated from certain causes are sometimes misapplied, simply because there is a similarity in the facts of two different cases, and sometimes the true principle is overlooked or forgotten and a new one invented to explain rules which from a historical standpoint are well established. The law is sometimes said to be the perfection of human reason, and it is further said that when the reason fails the law fails. But these expressions when applied to certain conditions are often mere platitudes. The law does not always proceed logically, for "the life of the law has not been logic; it has been experience. * * * Many things which we take for granted have had to be laboriously wrought out, or thought out in times passed." Holmes Com. L., p. 1. The principle involved in this case is that of the master's liability for the tort of his servant. Let us take a common illustration. The driver of a grocer's cart negligently runs over another in the street, the person injured being without fault.

The grocer is liable for the negligence of his servant, the driver. But why or upon what principle? It is sometimes said that the reason for the master's liability in such cases is his negligence in employing an unskilful servant. If this were really the true reason, the logical result would be that if the master was guilty of no negligence in employing the servant he would not be liable. This, however, we know does not follow. It is no defense that the master used the greatest care in employing his servant. Again, suppose an engineer or servant of a railroad company wilfully run a train of cars over another person ; we know the company is liable for the wrongful act of its servant, and that it is no excuse for the company to say it did not authorize the act and that it was done without the knowledge or consent of the company, or against its expressed will or order.

It is difficult to understand this principle of liability unless we approach it from the side of history. It is in reality a survival of the ancient doctrine that the master or owner was liable for the act of his slave and for injuries committed by animals in his possession. The ancient idea was that the family of the master, including his slaves, his animals, and all other property, was a unity ; and that the personality of the master affected all of his property ; that as he was entitled to all the benefits of ownership he must accept the consequences flowing from injuries caused by his property. He might buy off the vengeance of the injured person or he might appease it by surrendering the injured property to the person aggrieved. In Roman law there was a class of actions known as *noxal* actions, which provided for this vicarious liability. The defendant had the option of surrendering the delinquent instead of paying damages. In ancient times the masses were

slaves; in modern times the masses are freemen.    When slaves became freemen the master was shorn of his power to surrender the delinquent servant; but he still continues to be liable for the acts of his servant done in the line of employment.    This principle of liability originates in slavery and in the power and dominion that the master exercised over the members of his family.    But it may be said that, as the master has ceased to have any property in his servants, and as he is shorn of his power to surrender a delinquent, the reason for the rule fails, and that the law must fall with the reason, and that this would result in exonerating the master from all liability in all such cases.    It is true that the power of surrendering the delinquent has ceased, but it is not true that the personality of the master has ceased to affect his servants.    The will of the master dominates any given enterprise.    He calls to his aid servants and appliances.    The servant surrenders his time and in a measure permits the will of the master to dominate and control his actions.    He is the instrument of his master in accomplishing certain ends.    The servant is placed in the position and given the opportunity to commit the wrong by the will of the master.    In a qualified sense the servant is the representative of the master.    Without the controlling, dominating influence of the master's will there is but the remotest probability that the servant would have been placed in the position or given the opportunity to commit the particular wrong. Anciently the liability of the master was not limited by the duties imposed upon his slave.    When a servant became a freeman he was no longer a member of the master's family, and he could not properly be said to be the representative of his master except in the line of the employment.    Modern jurisprudence properly and justly limits the liability of the master to the acts of his ser-

vant done within the scope of the employment. There is still substantial and just grounds for the principle that the master is liable for the wrongful acts of his servant. No liability arises against the master for the wrongful acts of his servant unless the servant has perpetrated an injury either upon the person or property of another. Nichols was the servant of the plaintiff when he made the alteration of the note. But did he inflict any injury upon the property of the defendant? Certainly not. The injury, if any, was inflicted by the servant upon the property of his own master, and not upon the property of the defendants. If appellees' contention be true Nichols destroyed the plaintiff's note, and no recovery can be had upon it nor upon the original consideration. The principle that the master is liable for the tortious acts of his servant committed in the line of the employment has no application to the facts of this case, for no injury was done the defendants' property.

Even if it be conceded that Nichols was the agent of the plaintiff when he made the alteration, there is high authority sustaining the position that in doing so he exceeded his authority, and that his act would not be binding on his principal. An agent, to transact the business of the principal, is not clothed with authority to destroy the property of the principal or to violate a rule rule of public policy. *Nickerson* v. *Swett,* 135 Mass. 514; *Gleason* v. *Hamilton,* 138 N. Y. 353; *Hunt* v. *Gray,* 35 N. J. L. 227; *Yeager, Exr.,* v. *Musgrave,* 28 W. Va. 90; *Bigelow* v. *Stilphen,* 35 Vt. 521.

As announcing a contrary rule the appellees cite and rely upon *Hollingsworth* v. *Holbrook,* 80 Iowa 151; *Reynolds* v. *Witte,* 13 S. C. (Shand,) 5; *Bowser* v. *Cole,* 74 Tex. 222. These cases seem to support appellees' contention. We think the first rule is more in accordance with justice and right.

Kingan & Company, Limited, *v.* Silvers *et al.*

The change made in the note in this case was not only a material one, but, as it seems, one that could have been made only for a fraudulent purpose—that of increasing the obligations of the makers and inuring to the benefit of the holder. If the alteration was made for a fraudulent purpose and the act of Nichols be construed as the act of the plaintiff, then it would result in the plaintiff losing its debt entirely, for there can be no recovery upon the note in either its original or altered state, nor upon the original consideration, and the defendants would be forever released from paying the debt. No direct injury was done the defendants by the alteration of the note. The utmost that can be said is that a rule of public policy was violated. The doctrine of public policy, like the statute of frauds, should be invoked to prevent and not to perpetrate a fraud. A clear and unmistakable case of the violation of a rule of public policy should be made before the law will lend its aid to depriving one person of his property for the benefit of another.

Our conclusion is that Nichols, when he made the alteration of the note, stood in the relation to it of a stranger, and that his act was a mere spoliation.

In the consideration of this case we have been materially assisted by the oral argument and briefs of able counsel.

Judgment reversed at the cost of the appellees, with instructions to overrule the demurrer to the complaint.

DAVIS, C. J., and GAVIN, J., dissent.

Filed May 9, 1894; petition for rehearing overruled June 14, 1895.