E. J. Kennedy v. Union Charcoal & Chemical Company.*

(*Jackson*.   April Term, 1927.)

Opinion filed March 31, 1928.

1. AGENT.  SERVANT.

Agency, properly speaking, relates to commercial or business trans-
actions, while service has reference to actions upon or concerning
things.   (Post, p. 668.)

Citing: 2 C. J., 423; Meechem on Agency, secs. 1 and 2; Kingan v.
Silvers, 13 Ind. A., 80, 37 N. E., 413, 416.

2. MASTER AND SERVANT.  DOCTRINE OF LIABILITY.

The doctrine of the liability of the master for the wrongful acts of
his servant rests upon the doctrine of agency where by legal in-
tendment the act of the employee becomes the act of the em-
ployer.   (Post, p. 670.)

Citing: 18 R. C. L. (Master & Servant) secs. 247, 252, 255; Hall v.
Smith (2 Bing., 156, 160, 9 E. C. L., 357).

3. MASTER AND SERVANT.  LIABILITY.

If the circumstances involved in a case are consistent with, or re-
quire, the inference that the tort complained of was within the
scope of the servant's employment, the mere fact that the instru-
mentality, which occasioned the plaintiff's injury did not belong
to the master will not preclude a recovery of damages, the action
being maintainable or not maintainable according to the use by the
servant of the instrumentality was or was not expressly or im-
pliedly authorized by the master.   (Post, p. 672.)

Citing: LaBatt, Master & Servant (2d Ed.), p. 6888; Williams v.
National Cash Register Co. (Ky.), 164 S. W., 112; Dillon v. Pru-
dential Ins. Co. (Cal.), 246 Pac., 736; Elliason v. Western Coal &
Coke Co., 162 Minn., 213, 202 N. W., 485; Stuart v. Doyle (Conn.),

---

*On liability of master for negligence of servant based on doctrine
of respondeat superior, see 18 R. C. L., 787; 4 R. C. L. Supp., 1204;
6 R. C. L. Supp., 1084; 7 R. C. L. Supp., 608.

112 Atl., 653; Gibson v. Dupree (Col.), 144 Pac., 1133; Goodman v. Kennell, 3 Carrington & Payne, 167; McCaughen v. Missouri Pac. R. Co. (Mo.), 274 S. W., 197; Seaboyer v. Director General of Railroads, 244 Mass., 122; Goldsmith v. Chesebrough (Md.), 112 Atl., 285; Wilson v. Pennsylvania R. R. Co., 63 N. J. Law, 385, 43 Atl., 894; Stretton v. City of Toronto, 13 Ont. Rep. (1887) 139; St. Louis, I. M. & S. Ry. Co. v. Robinson, 117 Ark., 37, 173 S. W., 822.

### 4. MASTER AND SERVANT. LIABILITY.

Where it appeared that a servant in charge of a small manufacturing plant, whose principal duty was to see that the four other employees were kept at work, that the officers made all the purchases, sold all the output of the plant, with the exception that if a customer came to the plant to purchase one article, which the foreman was authorized to sell for cash, that the foreman went a distance of a quarter of a mile to make complaint against some material which had been furnished to the plant, that in going to the plant it was a five minute walk or a one minute ride in an automobile, that the employee went in his own automobile without either the knowledge or consent of the employer, the employer would not be liable in damages to one who was injured while riding in the automobile. (Post, p. 679.)

*Headnote 1. Motor Vehicles, 42 C. J., section 899.

---

FROM SHELBY

---

Appeal from the Circuit Court of Shelby County.— Hon. B. L. CAPELL, Judge.

KNIPMEYER & DIXON, for defendant.

J. S. EDMONDSON, for plaintiff.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

This suit was instituted by the plaintiff, E. J. Kennedy, against the defendant, Union Charcoal & Chemical Company, to recover damages for an injury resulting from a collision between a motorcycle, on which plaintiff was riding, and an automobile which Alt, an employee of defendant, was driving.

The trial court sustained the defendant's motion for a directed verdict. Upon appeal the Court of Appeals reversed the trial court and remanded the case for a new trial. A petition for *certiorari*, filed by the defendant, has heretofore been granted, and the case has been ably argued at the bar of this court.

The defendant is a New York corporation operating a small branch plant near the City of Memphis. It is engaged in grinding, sacking and selling charcoal.

Alt was in charge of the Memphis plant, the other force consisting of four negroes. Alt was more of a servant than an agent. His principal duty was to see that the four negroes were kept at work.

Some officer of the Company visited the Memphis plant every few weeks, made all of the purchases, sold the output of the plant, with the exception that if a customer came to the plant to purchase a sack of ground charcoal Alt was authorized to sell it to him for cash.

(1) The difference between an agent and a servant is fully discussed 2 Corpus Juris, 423. In a note at the bottom of the page it is said:

"Agency, properly speaking, relates to commercial or business transactions, while service has reference to actions upon or concerning things. Service deals with matters of manual or mechanical execution. An agent is the more direct representative of the master, and clothed with higher powers and broader discretion than a serv-

ant. Mechem, Agency, sections 1, 2. The terms 'agent' and 'servant' are so frequently used interchangeably in the adjudications that the reader is apt to conclude they mean the same thing. We think, however, that the history of the law bearing on this subject shows that there is a difference between them. Agency, in its legal sense, always imports commercial dealings between two parties by and through the medium of another. An agent negotiates or treats with third parties in commercial matters for another. *Kingan* v. *Silvers,* 13 Ind. A., 80, 37 N. E., 413, 416.''

Most of the charcoal which defendant ground came from the plant of the Forest Products Chemical Company, located a quarter of a mile from the plant of the defendant. It required five minutes to walk and one minute to ride in an automobile from one plant to the other, and they had telephone connections.

The facts which we wish to emphasize are that the defendant neither owned, used nor had any need for an automobile in connection with its Memphis plant. It did not authorize Alt to use his individual car in connection with his duties at said plant, and had no actual knowledge that he was so using it. His duties, according to the president of the Company, were confined to the plant.

On the morning of the accident Alt drove in his car from the plant of defendant to that of the Forest Products Chemical Company for the purpose of requesting it not to send any more wet charcoal. It was on the return trip that he collided with the motorcycle of plaintiff.

Assuming that Alt was at fault, the question is was he such an employee as to enable the plaintiff to invoke the doctrine of *respondeat superior?*

We will now state some of the principles of law governing cases of this character.

*(2)* In 18 R. C. L., under the title of Master and Servant, it is said:

Section 247. " 'The doctrine of the liability of the master for the wrongful acts of his servant is predicated upon the maxims *respondeat superior* and *qui facit per alium facit per se.* In fact, it rests upon the doctrine of agency.' By legal intendment the act of the employee becomes the act of the employer, the individuality of the employee being identified with that of the employer. The latter is deemed to be constructively present; the act of the employee is his act; and he becomes accountable as for his own proper act or omission. Ultimately, like every other rule of law, the principle finds its foundation in public policy and convenience. It may be thought to be a hard rule to fix liability on the employer, even when the employee has passed out of sight and control; but it is elemental that every person in the management of his affairs shall so conduct them as not to cause an injury to another. If he does not do so, and another sustains an injury, he must answer in damages. Inasmuch as he has made it possible for his employee to inflict injury, it is but just that he should be held accountable. 'The maxim of *respondeat superior,'* says Lord Chief Justice BEST in *Hall* v. *Smith* (2 Bing., 156, 160, 9 E. C. L., 357), 'is bottomed on this principle: That he who expects to derive advantage from an act which is done by another for him must answer for any injury which a third person may sustain from it.' "

Section 252. "In considering whether the wrongful act of the employee is in character such as to impose liability on the employer, the test recognized by every sys-

tem of jurisprudence, apparently, is whether there was authority express or implied for doing the act.''

Section 255. ''The courts are generally agreed that an employer may be held accountable for the wrongful act of his employee although he had no knowledge thereof, or disapproved it, or even had expressly forbidden it. And so the employer may be made liable for acts done in violation of his rules, orders or instructions. If he employs incompetent or untrustworthy agents he must bear the consequences. It has been said: 'If the servant's disobedience of instructions will exonerate the master, the proof, easily made, virtually does away with the maxim of *respondeat superior,* designed for the protection of innocent third persons, and obliging the principal to be careful in the employment of agents, to whom he intrusts the means of committing an injury.' ''

In Bashfield's Cyclopedia of Automobile Law (1927), vol. 2, p. 1375, the author says:

''So the ract that one employed to solicit orders has not been directed to use an automobile in performing his duties will not relieve his master and the owner of the machine from liability for his negligence in driving the machine while soliciting orders, if his use thereof is known to one of the managers of the business, and its use is for the employer's benefit, in that it enables the employee to see more people and presumably to make more sales; and an insurance agent to whom has been assigned a district comprising an area of over 200 square miles, and who is allowed to use any reasonable means of conveyance in performing his duties, may be found to be acting within the scope of his employment in using an automobile in the course of his duties.''

*(3)* In LaBatt, Master & Servant (2nd Ed.), p. 6888, it is said:

"If the other circumstances involved in a case are consistent with, or require, the inference that the tort complained of was within the scope of the servant's employment, the mere fact that the instrumentality, which occasioned the plaintiff's injury did not belong to the master will not preclude him from recovering damages. The action is deemed to be maintainable or not maintainable according as his use of the instrumentality was or was not expressly or impliedly authorized by the master. Such authorization is manifestly a proper inference wherever it is provided by the contract of hiring that the servant is to use, for the purposes of the stipulated work, an instrumentality belonging to himself."

Applying these rules to the facts of this case, it appears that Alt was the servant of the defendant and was engaged in his master's business at the time of the accident, but there is no evidence that the use of the automobile was either expressly or impliedly authorized by the master, and in all of the cases relied upon by plaintiff, with one exception, the courts found facts sufficient to support findings of implied authorization.

In *Williams* v. *National Cash Register Co.* (Ky.), 164 S. W., 112, Alexander was employed by the company to sell cash registers in a large territory. The company had knowledge that he used his automobile in soliciting orders and made no objection thereto, and in that way impliedly authorized its use. The only question involved in that case, however, was whether Alexander was a servant or an independent contractor.

In *Dillon* v. *Prudential Ins. Co.* (Cal.), 246 Pac., 736, it appears that McDonald was employed to cover a large

territory in delivering policies, collecting premiums and performing other services, using "any reasonable means of conveyance that would enable him to cover his territory."

In responding to the insistence that McDonald was not impliedly authorized to use his automobile, the court said:

"As to the reasonableness of the means of travel employed by the agent, certainly an automobile was a reasonable means of conveyance in a district as extended as that assigned to McDonald, and the superintendent of the insurance company testified that the agent was permitted to select his own means of traveling about, and that the company objected to no reasonable means."

The real question involved in the foregoing case was whether McDonald was a servant or an independent contractor.

This same question was likewise involved in *Elliason v. Western Coal & Coke Co.,* 162 Minn., 213, 202 N. W., 485. In that case the employee had been using his truck in delivering coal for defendant for some months and no question as to the authorization of the use of the truck by defendant was involved.

In *Stuart v. Doyle* (Conn.), 112 Atl., 653, it appears that O'Neil was employed in Shepard's plantation office as bookkeeper and in charge of inside office work. Shepard was dependent upon certain employment bureaus to furnish him labor for his plantation. On the day of the accident one of said agencies telephoned to O'Neil at Shepard's office that he was sending two hands out on the 4 o'clock train. Shepard had two trucks, which were usually operated by two licensed drivers, and these trucks were usually employed to transport laborers from

the station to the plantation. On this particular occasion O'Neil was unable to locate Stuart, and the court held that the jury was justified in finding that he was unable to get in touch with either of said drivers. In this situation, O'Neil undertook to convey in his individual car said two employees from the station to the plantation, and was so engaged when the accident occurred.

O'Neil, in his testimony, said:

"It was in my line of duty to receive telephone calls and in Shepard's absence to tell one of the drivers to get the men, and see that the men were delivered to the proper plantation. It was my duty to see that the help were delivered to the proper plantation."

After reviewing the evidence of O'Neil and Shepard, the court said:

"Under the evidence presented, ambiguous in its nature, it was a fact for the jury to determine whether the act of O'Neil in transporting the help on the night in question was warranted by the express or implied authority conferred upon him, considering the nature of the service required, the instructions given, and the circumstances under which the act was done."

The last case, *Gibson* v. *Dupree* (Col.), 144 Pac., 1133, holds that where the instrumentality (automobile) causing the injury belongs to or is under the control of the master and the servant, while acting within the scope of his employment, uses such instrumentality contrary to instructions, the master is liable. The court recognized a different rule where the instrumentality was neither owned nor controlled by the master, saying:

"There are cases where the instrumentality or means used by the servant did not belong to or were not with-

in the partial or entire control of the master, such as''
(Citing authorities).

On the other hand, there are numerous cases support-
ing our conclusion that Alt, in the circumstances, was not
impliedly authorized to use his automobile while engaged
in the master's business.

The most concise and pertinent statement of the gov-
erning principle, and the reason therefor, is found in
an old English case, decided in 1827, *Goodman* v. *Kennell*,
3 Carrington & Payne, 167, where a person occasionally
employed by the defendant as his servant, being sent out
by him on his business, took the horse of another person
in whose service he also worked, and, in going, rode over
the plaintiff. Mr. Justice PARK, who sat for the Lord
Chief Justice, in his opinion, said:

''I cannot bring myself to go the length of supposing,
that if a man sends his servant on an errand, without
providing him with a horse, and he meets a friend who
has one, who permits him to ride, and an injury happens
in consequence, the master is responsible for that act.
If it were so, every master might be ruined by acts done
by his servants without his knowledge or authority.''

In *McCaughen* v. *Missouri Pac. R. Co.* (Mo.), 274 S.
W., 197, a servant, while on the master's business, used
his individual automobile and injured plaintiff. In dis-
cussing the question of implied authorization of the use
of the automobile by the defendant, the court said:

''In the present case there was no evidence adduced
that Emmett Liese's contract of employment did em-
brace the use of an automobile. Neither is there any-
thing in the evidence tending to show that it was within
the contemplation of the parties that an automobile was
to be used by Liese for the purpose of transacting the

defendant's business; nor is there evidence that the use of an automobile was necessary or beneficial to the defendant in the performance of Liese's duties under his said employment. There is also no evidence tending to show that Liese, prior to the accident, was in the habit of going about the defendant's business with the machine. We find nothing in the evidence which would warrant a jury in finding that Liese was impliedly authorized to use the automobile in the service of the defendant at the time the accident occurred.

.   .   .   .   .   .   .   .   .   .   .   .   .

"It is contended by counsel for plaintiff that the fact that Liese used the automobile on the said Clayton trip is sufficient evidence tending to show that Liese used the automobile, at the time of the accident, with the implied authority and assent of defendant. We cannot give our assent to this contention. Where an automobile, although not owned by the master, is repeatedly used in the master's business with his knowledge and assent, there arises an implied assent and authority to use it in the master's business, rendering him liable to respond for the negligence of those using it in connection with his business. But the mere fact that an automobile was used by the servant on one occasion in the business of the master, unaccompanied with any evidence of similar acts in the meantime, does not justify the inference that the servant was later authorized to use the machine upon the master's business." (Citing authorities).

In *Seaboyer* v. *Director General of Railroads*, 244 Mass., 122, a helper on a truck, without authority, attempted to remove the truck in order to make place for another truck. General instructions prohibited the driv-

ing of a truck by a helper. The master was held not liable. In the course of the opinion the court said:

"The circumstance that on one occasion about a week before, when the regular operator was on the truck, he had driven it, was no evidence of authority to drive it alone."

In *Goldsmith* v. *Chesebrough* (Md.), 112 Atl., 285, it appears that the master had knowledge that his servant used his automobile at times in coming to the store but did not know that he used it when engaged in collecting and soliciting, and did not know that he used it on the day of the accident for such purposes.

The court adopted the statement from LaBatt, quoted hereinabove, and held the defendant not liable. With respect to other authorities, the court said:

"In *Wilson* v. *Penna. R. R. Co.*, 63 N. J. Law, 385, 43 Atl., 894, it is stated in the syllabus, which correctly states the finding of the court, that—

" 'The plaintiff was struck by a wagon belonging to the Adams Express Company, driven by a person employed by the Pennsylvania Railroad Company to carry United States mail, which was, in fact, in the wagon, but which previously had been carried on foot or in a pushcart. Held, that as there was no proof that the defendant had authorized its servant to use a wagon, the plaintiff should have been nonsuited.'

"In *Stretton* v. *City of Toronto*, 13 Ont. Rep. (1887), 139, it appeared that plaintiff was knocked down and severely injured by the negligent driving by one Bessey of a horse and buggy. This horse and buggy were not the defendants', but were the private property of Mr. Coatsworth, the city commissioner. Bessey was a servant of the defendant. A hydrant had burst, and Foley,

a servant of the defendants, who was attending to it, sent Bessey to his (Foley's) house for a wrench. Bessey, on his way there, without the knowledge or authority of Foley, and without the knowledge or authority of Coatsworth, took the horse and buggy, which he found standing in front of Coatsworth's office, for the purpose of more speedily getting the wrench, and in driving for it ran down plaintiff. The court in that case said:

" 'The defendants were sought to be charged for the negligent driving by Bessey, their servant, of a horse and buggy, causing injury to the plaintiff, and in order to establish this it was necessary for the plaintiff to show that the driving of the horse and buggy was in the course of Bessey's employment as the servant of the defendants. This he failed to do. Bessey, it is true, was the servant of the defendants, and in going for the wrench was acting in the course of his employment; but he was not acting in the course of his employment in going for it with a horse and buggy which he had wrongfully possessed himself of without the knowledge or consent of the defendants, and they were consequently not liable for his negligent driving of this horse and buggy.'

"In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Robinson,* 117 Ark., 37, 173 S. W., 822, the plaintiff was injured by being run into or struck with a bicycle, ridden by a call boy in the employ of the railway company. It was his duty to call the different train crews as directed, there being three or four of them to be called each day. The division foreman, on the morning of the injury, directed him to make calls of certain crews, and while on his way to do this the injury was inflicted.

"The boy was not employed to perform his services on a bicycle nor provided with or required to have one.

None of his predecessors had ever attended to the duties of calling the train crews with the aid of a bicycle. He rode from his home, which was beyond the call limits of the station, on his wheel when the weather conditions were favorable, and frequently performed his service of notifying the train crews by riding the wheel instead of walking.

"The court in that case said:

"The defendant railway company 'did not furnish a bicycle for his use in the service, nor require him to provide one therefor, and the duties imposed upon him to notify the other employees did not necessitate such dispatch in reaching them as required the use of a bicycle. It was employed by the caller to facilitate the performance of his duties mayhap, and certainly for his own convenience, and the mere fact that the agents of the railroad company knew that the call boy was using the instrumentality in the performance of his service was not an implied authorization of the use thereof by the master nor sufficient evidence of the necessity therefor. If the service required of the call boy could not have been performed in the time given therefor without the aid of the instrumentality used (the bicycle), it would have occasioned a necessity, and the knowledge by the agent of such use in the performance of the service would have amounted to an implied authorization thereof, making the railroad liable for a negligent injury therefor.' "

(4) To hold the master liable in the circumstances of this case would be to extend the rule of *respondeat superior* further than any adjudication, to which our attention has been directed, has yet gone, as well as beyond the rule of reason. Such a holding would be most disastrous in its results, and, as said by Mr. Justice PARK,

if this were the rule "every master might be ruined by acts done by his servants without his knowledge or authority."

For the reasons stated herein, the judgment of the Court of Appeals will be reversed and that of the trial court affirmed.