## GREAT ATLANTIC & PACIFIC TEA COMPANY *v.* GEORGE NOPPENBERGER
[No. 60, October Term, 1936.]

380

*Decided January 14th, 1937.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*G. Ridgely Sappington* and *D. Heyward Hamilton, Jr.,* for the appellant.

*James J. Lindsay*, with whom was *Philip S. Ball* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Great Atlantic & Pacific Tea Company, Inc., owns and operates a chain of grocery and provision stores in Baltimore City and the territory adjacent thereto. The stores which compose the chain are integrated as parts of one system or enterprise, and supplies found in one may

be and are from time to time removed to another as it happens that the one or the other is understocked or overstocked.

Each of the several stores, while subject to the general control of the owner, operates under a system of departmental separation under which its meat business and its grocery business are operated as separate departments. Each is in charge of a manager whose duties and authority are limited to the operation of the particular department to which he is assigned, and each department has its own corps of clerks and assistants. The chain is divided into groups, and to the same departments in each group an inspector or superintendent is assigned whose duties are to supervise and inspect the several stores in the group, and he in turn is subordinate to a superintendent in charge of the departments in the entire area.

Among the stores operated by the company was one at 1205 Greenmount Avenue, and another at 23 East North Avenue. The "meat manager" of the Greenmount Avenue store was John C. Whatmough, the superintendent of the meat departments of the group of stores, which included that store and the North Avenue store, was George E. Ruark, and the general superintendent of the "meat operation in Baltimore and vicinity" was Irving W. Rathbone. John H. Carter was also employed at the Greenmount Avenue store, as clerk in the grocery department, in which employment he was subject to the control of George Fowble, the manager of that department in that store.

On May 20th, 1935, Carter, at the direction of Whatmough, placed a number of lamb shoulders in an automobile owned by Whatmough for the purpose of transporting them to the North Avenue store.

At that time George Noppenberger, the appellee, was interested in an automobile business, known as the Independent Motor Service Company, which operated a garage at the intersection of Trenton Street and Love Grove Alley in the City of Baltimore. Carter drove to the

North Avenue store, which is at the intersection of Love Grove Alley, about half a block north of Trenton Street, and parked the automobile apparently on Love Grove Alley, which slopes towards Trenton Street, and took the shoulders from it to carry them to the store.

Noppenberger was then at work on a Lincoln automobile parked in front of his garage, and standing between the bumper of that machine and a small Ford machine parked about eighteen inches in front of it. While he was in that position, the automobile driven by Carter ran down the alley, struck the Lincoln car, drove it against the Ford, and pinched Noppenberger between the two, breaking his leg and otherwise severely injuring him.

Following the accident, the appellee brought this action to recover compensation for the injuries he had suffered as a result of it. The case was tried before the court and a jury, the verdict was for the plaintiff, and from the judgment on that verdict the defendant appealed.

The negligence of Carter appears to have been conceded, and, while none of the pleadings appear in the record, it may be assumed that the only question considered in the trial court was whether at the time of the accident Carter was acting within the scope of his employment as a servant of the appellant. The record presents thirty-three exceptions, of which thirty-two relate to rulings on evidence and one to the court's rulings on the prayers.

The appellee offered two prayers, both of which were granted, and the appellant seven, of which one was granted and the others refused.

The defendant's "B" prayer was a general demurrer to the evidence, and its first prayer asked the court to direct a verdict for the defendant on the ground that the uncontradicted evidence showed that the driver of Whatmough's automobile was not authorized by it to use it for the purpose of transporting goods from one of its stores to another. The refusal of these prayers

raised the important question presented by the appeal, which is whether, in using Whatmough's automobile to transport defendant's supplies, Carter, the driver, was acting within the scope of his employment as defendant's employee.

it appears without contradiction that Whatmough and Carter were both employed by the defendant, Whatmough as manager of the meat department, and Carter as a clerk in the grocery department, of its Greenmount Avenue store, and that Whatmough was subordinate to Ruark, the assistant superintendent of the meat departments of a group of stores which included that store and the North Avenue store, and subject to his (Ruark's) orders. It also appears without contradiction that Carter was not licensed to operate a motor vehicle over the public highways of the state, and that in operating Whatmough's automobile he violated its motor vehicle laws.

Whatmough owned a Chevrolet sedan which he used to travel back and forth between his place of business and his home. There was evidence tending to show that the brakes on that automobile were out of repair and ineffective, although he said that, so far as he knew, they were in good condition on the day of the accident. He testified that "on the grocery side" of the Greenmount Avenue store there were two clerks and a manager, and "on the meat side" one manager. It is consistent with his testimony that he was the only employee on "the meat side."

He said in the course of his testimony that in the forenoon of May 20th Ruark came into the store, checked his orders and "backwork," looked in the icebox and said, "You have a lot of lamb shoulders," and that he replied, "Yes, sir. Can any of our stores use them," and that Ruark then said, "Yes, 23 East North Avenue"; that just then a customer came in who wanted a leg of lamb; he did not have a leg of lamb there then, so he asked Carter, a grocery clerk, to take the shoulders to the North Avenue store and bring back a leg of lamb. He further testified that there was no telephone in the store, and that the lamb shoulders weighed in the aggregate twenty-three or

twenty-four pounds. On the Wednesday following the Monday on which the accident occurred, Ruark returned to the store, paid Whatmough for his services, and told him "that he was finished," and on the following day he went to see Rathbone, the general superintendent, at the general offices of the southern division of the company, to learn why he was "laid off," and that Rathbone told him it was because "orders came down from higher up that his cutting rate was not so good." He explained by cutting rate he meant the manner in which the meat was cut to produce a given percentage of profit.

On cross-examination he testified that the "meat manager" and the "grocery manager" were separate, that Carter was not "under him at all," and that Ruark was his immediate superior, and he then gave this testimony:

"Did you have any authority from him to send this boy Carter out driving your automobile? A. Well, I did it before and he knew about it. Mr. Rathbone had seen him on the street and he seen me on the street and said, if I needed anything to send somebody else. Q. Were you ever authorized by any of these people to send Carter? A. No. Q. Didn't you know as a matter of fact that Carter had no license to drive? A. Carter had a learner's license and he has driven cars before. Q. Wasn't it necessary in order to use that license to have somebody with a driver's license. Didn't you know that he had no right to drive a car by himself with that license? * * * The Witness: Yes, sir."

He further testified: "Did I understand you to say that Mr. Ruark told you to take those shoulders up to North Avenue? A. Yes, sir. Q. He didn't tell you to find out first whether North Avenue wanted them or not? The Witness: I think Mr. Ruark did say something about telephoning but I didn't have his 'phone number and I needed the leg of lamb, and I figured to kill two birds with one stone. Q. Then Mr. Ruark did tell you first to telephone up there and find out whether they wanted them? A. I think he did, I am not sure. * * * Now, during a previous occasion, hadn't Mr. Ruark transported stuff like that in

his car from one store to another? A. Different occasions I have sent stuff out before like that. Q. Just a minute. On previous occasions hadn't Mr. Ruark carried stuff like that? A. He did and he didn't. Q. Did he ever do it? A. Yes, sir, at times. Q. Now, if it was too much stuff for Mr. Ruark to carry at times didn't they send the truck there? A. No, sir. Q. The truck has never been there? A. The truck has never been used at my store. Q. During your period? A. During my period—to bring stuff but not to take meat away."

He was then asked, "Did you deliver orders from the store where you were employed?" and he replied, "When I had a helper I did, and then I was told not to leave the store, that I was the manager and they didn't want the manager to leave, and that's why I asked John to go up the other store for me. The Court: How often was your automobile used in delivering orders of the company? A. Why I would not say it was used every day, maybe once in a while or three or four times a week." He further said that he had "got John before to drive it," that he paid for the gasoline with his own money, and that he paid for the cab in which Carter returned after the accident.

Ruark, testifying for the defendant, gave a different version of the conversation between him and Whatmough; he said: "Well, Monday morning I went in there—of course, we usually look around the icebox—and saw he had quite a few lamb shoulders, and I said, 'Charley, it looks as though you have too many on hand,' and he said, 'Yes, sir.' I said, 'All right, you call 23 East North Avenue, and if they need them I will be glad to move them for you as I go along.'" He also said that he never authorized Whatmough to use his own automobile on the company's business, that he had never authorized him to send Carter or anyone else out driving that car on company's business, and that "On several occasions he had checked Whatmough—warning that he could not use the car on the company business—and he was advised of that. Whatmough was so notified. He talked to Whatmough as

to the reasons why he was laid off. He told Whatmough that he was suspended indefinitely on account of disobeying the company's rules of using his car. He told him he was suspended indefinitely for disobeying the company's orders, that was, of using the car on company business—they would not allow him to do that. He checked him on it several times in person that he could not use the car on the company business. * * * He had a card with a list of things on it, and when he called it to the man's attention he checked it, and that is what he meant by 'checking.' " He said that all meat managers have assistants, and that on the day of the accident Whatmough "had him as assistant," but it does not appear who "him" was, that if supplies in the stores ran short they would apply to him and he would procure what they needed, that before taking meat to deliver he did not always have the manager of a store telephone to find out what another store needed, but did so on different occasions.

He then testified: "Well, why did you do it on this particular morning? A. First because I usually hit 23 East North Avenue first and if 23 East North Avenue needed the shoulders I would have naturally hit 1205 Greenmount Avenue first and taken them up to 23 East North Avenue. Q. Why didn't you, when you still have thirteen or fourteen stores to stop at that morning, take the shoulders with you at that time? A. Because I had already been to 23 East North Avenue. Q. And that was the only store you thought might need them? A. That's the only store I thought would need them that I had already been in." He further said that he had not told Whatmough that he could not let Carter drive his car on company business.

Rathbone testified that he had not spoken to Whatmough about cutting rates at all, but had told him that he had been dismissed for using his personal car on company business, that he had previously learned of an instance in which Whatmough had so used it and had warned him then, and that Whatmough had promised not to do it again. He admitted that he knew of at least one store

where the manager delivered goods in his own automobile with his own insurance covering it, but said that the company did not tell him to do that, although it did not discharge him for doing it.

The two prayers under consideration concede for their purpose the truth of such of these facts as tend to support the plaintiff's right to recover, together with such inference as may naturally and legitimately be deduced from them. The question which we are required to decide is whether they are legally sufficient to support an inference that, at the time of the accident, Carter was acting within the scope of his employment as a servant of the appellant. It is undisputed that he was at the time employed by the appellant, and it may also be assumed that he was not expressly authorized by the defendant to use Whatmough's automobile to transport the lamb shoulders to the North Avenue store, for there is no evidence of any such express authorization. The appellant contends that he was not acting within the scope of his authority, even though he was at the time engaged in transacting the master's business, for the master's benefit, at the request of another servant of the master, and at a time when he was in the service of the master. In support of that contention it relies largely upon analogies drawn from the relation of principal and agent and master and servant. But, as pointed out in *Mechem on Agency*, sec. 36, there is this distinction between the two, that a conventional agent is employed to represent the principal in relation to some contractual obligation with a third person, whereas a servant is employed to render service to, rather than for, the master, although it may happen that the service will involve relations with third persons. While both relations rest in contract, in measuring the extent of an agent's authority emphasis is more often placed upon the terms of the contract than in the case of a servant, where the emphasis is ordinarily placed upon the nature of the employment. The distinction is seldom of importance, although it may become so where the inquiry is directed to the liability

of one for the tortious acts of his representative. In the case of an agent, that liability often depends upon an apparent authority of the agent, for, since it is his function to create primary obligations giving rise to primary rights, the person with whom he deals as the representative of his principal may justly complain if he is permitted by the principal to display an appearance of authority which has never in fact been granted to him. In the case of a servant, whose acts do not create, but violate, primary rights, and give rise to secondary obligations and remedial rights, appearances are of less importance because ordinarily the third party is not misled by the master's representations of the servant's authority. *Huffcut on Agency*, sec. 5. In such a case the course of employment is said to be the basis of liability. *Id.* The fact that "the actor was in the general employment of the master does not" create an inference "that a given act done by him was within the scope of his employment," (*A. L. Inst., Restatement, Agency*, sec. 228, comment b), for to be within the scope of the employment the conduct must be of a kind the actor is employed to perform, occur during a period not unreasonably disconnected from the authorized period of employment, in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master. *Id.*, secs. 228, 229, 233, 234, 235, 236.

On the other hand, certain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: —(a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and

the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal." *Id.,* 229. And an act may be within the scope of the employment, even though forbidden or done in a forbidden manner (*Id.,* 230), or consciously criminal or tortious (*Id.,* 231; 39 C. J. 1294; *Panama R. Co. v. Toppin,* 252 U. S. 308, 40 S. Ct. 319, 64 L. Ed. 582, affirming judgment (C.C.A.), 250 Fed. 989; *Stinson v. Prevatt,* 84 Fla. 416, 94 So. 656; *McMillen v. Steele,* 275 Pa. 584, 119 A. 721; *Cate v. Schaum,* 51 Md. 299, 309; *Carroll v. State,* 63 Md. 551, 3 A. 29; *Balto. & O. R. Co. v. Barger,* 80 Md. 23, 30 A. 560; *Balto. Consol. Ry. Co. v. Pierce,* 89 Md. 495, 43 A. 940; *Rickards v. Rickards,* 98 Md. 136, 142, 56 A. 397; *Balto. & O. R. Co. v. Strube,* 111 Md. 119, 73 A. 697; *Patapsco Loan Co. v. Hobbs,* 129 Md. 9, 98 A. 239; *Id.,* 134 Md. 222, 106 A. 619; *Wilson Amusement Co. v. Spangler,* 143 Md. 98, 121 A. 851), or done by one employed or procured by the servant to assist him, where there is authority, either express or implied, to employ assistants, and such authority may be implied from the nature of the work and the general course of the master's business. 39 *C. J.* 1271; *Mechem on Agency,* sec. 1866 et seq.; *A. L. Inst., Restatement of Agency,* sec. 81; *Maryland Annotations, Restatement of Agency,* secs. 79-81.

The servant may also act within the scope of his employment in using an instrumentality not expressly authorized to effect a result which he has been ordered by the master to accomplish, where the means to be used are not specified (*A. L. Inst., Restatement of Agency,*

sec. 239; *Maryland Annotations,* sec. 239; *Labatt on Master and Servant; Goldsmith v. Chesebrough,* 138 Md. 1, 113 A. 285; *Regal Laundry Co. v. Abell Co.,* 163 Md. 525, 163 A. 845), and no other means of obeying the order are available. *Kennedy v. Union Charcoal & Chemical Co.,* 156 Tenn. 666, 4 S. W. (2nd) 354; *Khoury v. Edison Electric Illuminating Co.,* 265 Mass. 236, 164 N. E. 77; *Wesolowski v. John Hancock Mut. L. Ins. Co.,* 308 Pa. 117, 162 A. 166. For, if "the master directs a servant to accomplish the result and does not specify the means to be used, the servant is authorized to employ any usual or suitable means." *A. L. Inst., Restatement of Agency,* sec. 239, comment a. And the authority to use the instrumentality may be implied from the necessity.

All of these particular applications of the doctrine of *respondeat superior* arise from the principle that the liability of the master for the tortious acts of the servant rests at last upon the existence of authority, that the act must have been done in the course of an employment which the master has authorized, and that, unless such authority can be shown, there is no liability.

In testing the application of the doctrine to particular cases courts have in some instances assumed that a given act was or was not done in the course of the employment accordingly as the master did or did not have control of the servant at the time (*Khoury v. Edison Electric Illuminating Co.,* 265 Mass. 236, 164 N. E. 77), in others that it depended upon whether the act was a natural and necessary incident of the service (*Guitar v. Wheeler* (Tex. Civ. App.), 36 S. W. (2nd) 325; *Regal Laundry Co. v. Abell Co., supra*), but these different approaches are only superficially different, for beneath all of them lies the essential premise that liability depends upon authority, express or implied.

Turning again to the facts, for the purpose of the two prayers under consideration it may be assumed that Whatmough, who owned the car which caused the accident, and Carter, who drove it, were both employed in the same store by the same employer, Whatmough as mana-

ger of the meat department and Carter as a grocery clerk, and that the two departments were operated separately; that Whatmough had nothing to do with the grocery department and that Carer had nothing to do with the meat department; that there was no telephone in the store; that no delivery vehicles owned by the common employer of Carter and Whatmough were used in connection with the store; that merchandise bought in the store was carried away by the purchaser and not delivered by the employer outside of the store; that Whatmough was the only employee on the meat side, for, while Ruark said that on the day of the accident Whatmough "had him as assistant," it also appeared that his duties required him to supervise a group of nineteen stores, and that before he reached the Greenmount Avenue store he had visited seven other stores; that Ruark, to whom Whatmough was subordinate, ordered Whatmough to take a number of lamb shoulders from the Greenmount Avenue store to the North Avenue store, about one and one-half miles away; that prior to that Whatmough had been told not to leave the store, and it is consistent with the testimony that, if he had left, there would have been no employee left in the meat department; that the only vehicle available for transporting the shoulders was Whatmough's automobile, unless he hired a vehicle, and it does not appear that he was authorized to incur the expense of hiring a vehicle for that purpose; that Whatmough had on some prior occasion or occasions sent Carter out on similar errands in his automobile and that Ruark knew about it, and that Rathbone had "seen me on the street and said, if I needed anything to send somebody else"; that Whatmough asked Carter to go because he (Whatmough) had been ordered not to leave the store, and that he had used the automobile on other occasions on company business and had sent Carter to drive it, although he knew that Carter had no driver's license; that Whatmough had been repeatedly warned against using his automobile on company business, and on one occasion Rathbone saw him coming into the store with a

side of beef which he had brought from another store, presumably in his automobile, and had warned him never to use his own car on company business. Disregarding any conflict in the evidence as to these facts, which we must do in considering these two prayers, in the opinion of a majority of the court they are sufficient to permit an inference that at the time of the accident Carter was acting in the course of his employment as an employee of the appellant, and that the prayers were properly refused.

The basis of that conclusion is that Carter was at the time actually engaged in the master's business, that he was so engaged at the request of Whatmough, that Whatmough's authority to make that request as well as to direct Carter to use his (Whatmough's) automobile in carrying it out, may be implied from the fact that Whatmough had been ordered by the employer acting through Ruark to take the shoulders to another store, and that he had no means of complying with that order except those which he used, and that, while he had been warned not to use his automobile on company business, the company knew that he did so use it, but took no adequate measures to prevent such use of it. 39 *C. J.* 1285. The several factors affecting the question, such as the facts that the instrumentality used was not the property of the master, that its use was contrary to the master's orders, and that it involved a violation of the motor vehicle laws, cannot be considered as though they were separate and independent, because they must all be considered in connection with the single question whether, notwithstanding those facts, when the master ordered Whatmough to do an act without specifying the manner in which it was to be done, it did not by implication authorize him to use the only means available to him to accomplish it. *Goldsmith v. Chesebrough, supra,* illustrates the type of case in which the facts were insufficient to justify an inference of implied authority to use an instrumentality not controlled or owned by the master, because not only was there no necessity for such use, but the master had pro-

vided other means of transportation. *Lewis v. National Cash Register Co.,* 84 N. J. Law, 598, 87 A. 345, 346, illustrates the type in which such authority might be implied from the necessities of the case. In that case the servant was employed by the master to sell its machines, but the master furnished no means of transporting them. In holding that authority to use his own automobile might be implied the court said: "It is apparent from a plain reading of the contract that it was fairly within the contemplation of the parties that Kaler was to use some means of conveyance to effectually prosecute the master's business. The appellant would hardly have expected that Kaler was to carry heavy cash registers to customers or prospective ones in any other way than by some kind of a vehicle."

The plaintiff's first prayer, which was granted, instructed the jury that the mere fact that the automobile operated by Carter at the time of the accident did not belong to defendant would not bar the right of the plaintiff to recover if they found that "the use" had been authorized "expressly or impliedly" by the defendant. That prayer was granted in connection with defendant's fifth prayer, which stated the converse of that proposition. It is true the prayer did submit to the jury an hypothesis of which there was no legally sufficient evidence, that of express authority, but, in the absence of a special exception, that objection is not open in this court. Code, art. 5, sec. 10.

Defendant also objected to it on the ground that it assumed as facts that Carter and Whatmough were employees of the defendant, and there is force in that criticism too, but for the same reason that objection is not open for review.

The defendant also specially excepted to the prayer on the ground that it submitted a question of law to the jury. That exception should have been sustained. The whole question in the case was whether certain facts were legally sufficient to permit an inference of implied authority. Whether the facts existed was for the jury,

396

whether if they existed such an inference might be deduced from them, was not only a question of law, but the most important legal question in the case, and was for the court. The principal argument in this case was whether the facts justified an inference of implied authority. It was asking a great deal of a jury to expect them to answer that question without some guidance or direction from the court, and yet that was the effect of the prayer, for it left it to the jury to determine whether the use of the automobile was "authorized either expressly or impliedly." The special exception should therefore have been sustained and the prayer refused.

Defendant's second and third prayers were predicated upon a general failure of evidence as to Whatmough's authority (1) to instruct Carter to use the automobile, (2) or to use it to transport meat. But it has been repeatedly held that a prayer in that form is bad. *Rent-A-Car Co. v. Fire Ins. Co.*, 161 Md. 249, 265, 156 A. 847; 2 *Poe, Pl. & Pr.*, sec. 297; Code, art. 5, sec. 10. Its fourth prayer stated the proposition that, if Carter had no license at the time of the accident to operate an automobile in Baltimore city, the plaintiff could not recover. For reasons stated *supra* that proposition was unsound and the prayer was properly refused.

Defendant by its sixth prayer asked the court to instruct the jury that if "Whatmough had no authority from the defendant to instruct Carter to drive the automobile referred to in the evidence for the purpose of transporting meat from the defendant's store at 1205 Greenmount Avenue to its store at 23 East North Avenue, then their verdict must be for the defendant." The appellee criticized the prayer on the ground that the use of the term "no authority" was misleading. We find no serious objection to the expression on that ground. Nothing can be more comprehensively exclusive. If Whatmough had had any authority of any kind, express or implied, the jury could not have found that he had "no authority." But there is another objection to that prayer. The appellee predicated the conclusion submitted by his

first prayer upon a finding that the use of the automobile was "authorized either expressly or impliedly" by the defendant. The appellant specially excepted to it on the ground that that expression submitted a question of law to the jury, and for the reasons assigned in dealing with that exception we concluded that the objection was well taken, and that the objection should have been sustained. The same objection applies to this prayer. It was not misleading, but it did submit a question of law, as to what constituted authority, and was properly refused for that reason.

The evidence involved in the first and second exceptions, while of doubtful materiality, was quite harmless. Exceptions numbered 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 relate to the action of the trial court in allowing certain questions in the cross-examination of the witness Ruark. In view of the discretion reposed in the court, and the harmless character of the testimony, there was no reversible error in these rulings. Exceptions numbered 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, related to questions asked in the cross-examination of the witness Rathbone, designed to test the accuracy of his statement that the company did not authorize its employees to use their private automobiles on company business, and for that purpose was proper cross-examination. Exceptions numbered 30, 31, and 32 were to questions allowed in the cross-examination of the witness Carter. The purpose of the questions is not apparent, but in view of their nature it is impossible to believe that men qualified to serve on a jury could have been influenced by either the questions or the answers, and, if it be conceded that they were improperly allowed, the error was harmless.

Exceptions 3 and 4 were to the refusal of the court to permit the defendant to show in the cross-examination of Whatmough that he had not been sued by the plaintiff. We find no impropriety in these rulings. The mere fact that the witness had not been sued could not affect his credibility by showing that he had any interest in the litigation, was wholly negative, and quite unlike *Caroline*

*County v. Beulah,* 156 Md. 680, 683, 145 A. 177, where the witnesses for the plaintiff were asked if they did not have suits of their own against the defendant.

The ruling involved in the fifth exception relates to the allowance of a question in the cross-examination of Ruark as to the number of assistant managers employed by the defendant in Baltimore. The question was irrelevant, not germane to the direct examination, and should not have been allowed. The sixth was to the allowance of a question in the cross-examination of the same witness as to whether the defendant made deliveries in Baltimore City. The inquiry was relevant and proper.

From these conclusions it follows that the judgment appealed from must be reversed.

> *Judgment reversed, with costs to the appellant, and case remanded for a new trial.*

PARKE, J., concurs in the result.