**STATE OF MARYLAND, to the Use and Benefit of Francis X. GAEGLER, Jr., husband of Mary S. Gaegler, deceased, and Francis X. Gaegler, Jr., Administrator of the goods of Mary S. Gaegler, deceased, and State of Maryland, to the use and benefit of Francis X. Gaegler, III, minor son of Mary S. Gaegler, deceased, by his father and next friend, Francis X. Gaegler, Jr., and Francis X. Gaegler, III, a minor, by his father and next friend Francis X. Gaegler, Jr., and Francis X. Gaegler, Jr., individually**

v.

**Leo THOMAS and Henry C. BUNGIE, t/a Washington-Solomons Freight Line.**

**Civ. No. 10943.**

United States District Court
D. Maryland.

May 21, 1959.

Saul M. Schwartzbach, Takoma Park, Md., for plaintiffs.

John M. McInerney, Bethesda, Md., and John K. Barbour, Jr., Baltimore, Md., for Thomas.

James F. Couch, Jr., Mt. Rainier, Md., and Philip Shinberg, Washington, D. C., for Bungie.

THOMSEN, Chief Judge.

On Saturday, September 13, 1958, about 4:15 p. m. a truck owned by defendant Bungie and driven by defendant Thomas collided with an automobile driven by plaintiff's decedent, Mary S. Gaegler, in which her husband, Francis X. Gaegler, Jr., and her four year old son, Francis X. Gaegler, III, were passengers. All of the Gaeglers were hurt, and Mrs. Gaegler died of her injuries an hour or two later. Their several claims have been joined in this civil action.

Thomas drove the truck on the wrong side of the road and collided head-on with plaintiffs' car. His negligence and the absence of contributory negligence on the part of the occupants of the automobile are too clear for extended findings. However, Bungie denies that he is liable for the negligence of Thomas, and that issue will be considered first.

## I.

Bungie is in the trucking business, with an office at 4311 Sheriff Road, N. E., Washington, D. C. He owns the pick-up truck involved in the accident, which is used for local hauling and in connection with a farm which he owns at Deale, Maryland. Bungie's home is at 929 48th St., N. E., a few blocks from his office. He keeps his trucks in the yard at his home, and usually leaves a key under the floor mat of each truck, although his employees are not allowed to use the trucks without his permission.

Thomas first worked for Bungie in 1957, on his days off from another job. In the spring of 1958 he started to work for Bungie regularly, five days a week and sometimes on Saturdays and Sundays, in the trucking business and on the farm. Thomas had a half interest in one of Bungie's hogs, and from time to time obtained skim milk from a Washington dairy, hauled it out to the farm in the pick-up truck or in Thomas' own automobile, and fed it to the hogs. Thomas had always obtained permission to use the truck.

On Friday, September 12, Thomas worked with Bungie on the farm and was paid his weekly wages by Mrs. Bungie in Washington about 6:00 p. m. I find from conflicting evidence that it was understood between Thomas and Bungie at that time that Thomas would haul some milk to the farm in the pick-up truck on Saturday morning unless Bungie gave him other instructions. About 11:30 p. m. on Friday, Thomas called at the Bungie home; he was told that he might be needed for some sort of hauling work on Saturday, and that he should "come out" in the morning, whether to the house or to the office is not clear.

About 6:30 a. m. on Saturday Bungie left home, obtained an order for a hauling job that day, and reached his office about 8:30. Meanwhile, about 8:00, Thomas came out to the house, left his own car in the yard, was told by Mrs. Bungie that she had nothing to tell him, and drove the pick-up truck to the office. Again he was told that there were no instructions for him, so he drove off to pick up the milk. This took all morning, but about noon he stopped at the office and at the house and was told by Bungie's daughter that there was a hauling job to be done and that her father wanted Thomas to go to Featherstone's filling station and wait for him there. This program did not appeal to Thomas, who had six cans of milk on the truck, and other plans for the late afternoon. Nevertheless, he drove the truck to Featherstone's, but when he found that Bungie was not there, he drove out to the

farm, fed some milk to the hogs, watered the cattle, picked some tomatoes for his own use, and did other work about the place. Just before he reached the farm he met a man who was threatening to repossess some hay he had sold to Bungie, so Thomas phoned the house and left a message with Mrs. Bungie. About 3:00 p. m. Bungie arrived at the farm and shouted angrily to Thomas that he had made Bungie lose a job; he did not accuse Thomas of taking the truck without authority. A short time later Bungie invited Thomas to accompany him on a trip to a grocery store in Bungie's automobile, but Thomas declined. I find that Bungie expected Thomas to wait at the farm until Bungie returned, but did not order him to do so, and did not forbid him to drive the truck home. A short while after Bungie left for the store, Thomas started back to the city in the truck, carrying at least one empty milk can. The accident happened en route.

█ Bungie contends that Thomas had no permission to use the truck on Saturday, that he took it for his own purposes because of his interest in the one hog, or to get produce for himself, and that he violated Bungie's orders by going to the farm rather than by waiting at Featherstone's and by driving home rather than by waiting at the farm. I have found that Thomas had implied if not express permission to use the truck to take the milk to the farm, where it was fed to all of the hogs. The trip was for the benefit of Bungie at least as much as for the benefit of Thomas. It is true that Thomas violated Bungie's order by not waiting at Featherstone's. But "an act, although forbidden or done in a forbidden manner, may be within the scope of the employment". Great Atlantic & Pacific Tea Co. v. Noppenberger, 171 Md. 378, 391, 189 A. 434; Fowser Fast Freight v. Simmont, 196 Md. 584, 592, 78 A.2d 178, 181. Bungie did not order Thomas to wait for him at the farm.

█ There is a rebuttable presumption that the driver of an automobile is the agent and servant of the owner. Fowser Fast Freight v. Simmont, 196

Md. at page 588, 78 A.2d at page 179; Jordan Stabler Co. of Baltimore City v. Tankersly, 146 Md. 454, 126 A. 65.

This is not a departure case, cf. National Trucking & Storage v. Durkin, 183 Md. 584, 39 A.2d 687, nor the case of a servant who was doing something entirely different from that which he was employed generally to do, cf. Lustbader v. Traders Delivery Co., 193 Md. 433, 67 A.2d 237. At its strongest for defendant Bungie, this case is more like Adams Express Co. v. Lansburgh & Bro., 49 App. D.C. 144, 262 F. 232, which the Maryland Court distinguished from Lustbader, 193 Md. at page 441, 67 A.2d at page 240.

█ In Great Atlantic & Pacific Tea Co. v. Noppenberger, 171 Md. at page 390, 189 A. at page 439, Judge Offutt cited with approval ten sections of the Restatement of Agency. Applying to the facts of the instant case the tests set out in the Maryland decisions and in the pertinent sections of the Restatement, I find that Thomas was acting within the scope of his employment while driving the truck back to the city. Under Maryland law Bungie is liable for the negligence of Thomas at the time of the accident. Scott v. James Gibbons Co., 192 Md. 319, 64 A.2d 117; Fowser Fast Freight v. Simmont, supra; Great Atlantic & Pacific Tea Co. v. Noppenberger, supra; Jordan Stabler Co. of Baltimore City v. Tankersly, supra.

## II.

Immediately after the impact, Mrs. Gaegler was leaning against the steering wheel, bleeding from the nose. Her jaw was badly broken, impairing her breathing. After being assisted from the car, she was unable to walk, and lay on the surface of the road for about twenty minutes, in great pain and distress, until the ambulance arrived. Upon reaching the hospital, she was conscious but hysterical. Two doctors treated her for shock and tried to clear the blood from her mouth. Her breathing was so difficult that they did a tracheotomy resection under local anaesthetic, but she died at 6:45 p. m., of hemorrhage and shock.

Mrs. Gaegler was born in 1926 and started to work when she was nineteen or twenty. She was married in 1952, and her son was born in 1954, but she enjoyed her work, and returned to her job after six months' leave. She was an executive secretary with the AFL-CIO in Washington, earning $109.25 a week at the time of her death.

Francis X. Gaegler, Jr., husband of the decedent, was born in 1928, and was admitted to the bar in 1957. Before that, he had worked for the Treasury Department, attending college and law school at night. He had been practicing for less than a year at the time of the accident, and his earnings had not equalled his wife's salary. He sustained a broken nose and numerous bruises as a result of the impact. He was in a state of shock at the scene of the collision and at the hospital, where he tried to help the doctors who were treating his wife until he was banished from the accident room. His nose was set that evening and he remained in the hospital overnight, returning the next day for dressings. He had had a peptic gastric ulcer in 1957, which had responded to treatment, although he was supposed to continue taking medicine. The emotional strain following the accident and his wife's death, together with his inability to eat for several days, brought on stomach pains, for which his doctor prescribed the same medicine he had previously taken.' He did not consult his doctor again until shortly before the trial; X-rays then taken showed a recurrence of the ulcer.

Francis X. Gaegler, III, was nearly four years old at the time of the accident. He suffered a broken nose, cuts, bruises and shock. His nose was set, and he remained in the hospital until after his mother's funeral. His pediatrician checked on his bruises, and the surgeon who set his nose saw him half a dozen times. He has no permanent injury except a small scar along the tip of his nose. He was disturbed and distressed by his mother's death, and his father remained home from work for several months "trying to normalize the boy", which the father now admits was a mistake, for the father was more emotionally upset than the son. In February 1959 the father took the boy to a psychiatrist, who has seen the boy six times and has talked to the father three or four times. The psychiatrist, a relatively young man, was trained as a pediatrician and then branched out into psychiatry. He is now studying psychoanalysis and is himself being analyzed. He says the child has a severe emotional disturbance and will probably need treatment for a year. Despite the fact that he felt the father was suffering from a severe anxiety reaction, he accepted the father's history of the child's condition before, at the time of, and since the mother's death, and did not talk to the child's pediatrician. I observed the boy in the court room for two days; he appeared entirely normal, and gave no sign of emotional disturbance. I do not find and I do believe a Maryland jury would find that he needs further psychiatric treatment.

Gaegler was evidently dependent upon his wife emotionally as well as financially. His natural shock and distress as a result of her death and worry about its effect on their son was aggravated by the trial and his preparation therefor. Both the father and the child will be much better when the child is sent to kindergarten and the father devotes more time and thought to his law practice.

Gaegler was lead by his attorney to say that his wife would have worked until she was sixty-five, but said that he had hoped to be able to support his wife after he had established himself in the law. The deceased liked her job and would probably have continued working longer than was strictly necessary. This is a case of mutual dependency, see States Engineering Co. v. Harris, 157 Md. 487, 146 A. 392, which would have varied over the years. In some years there would probably have been a net pecuniary benefit to the husband; in some years none.

The Court of Appeals of Maryland has repeatedly held "that in any action brought under the statute for death caused by negligence, the jury may award

damages for pecuniary losses which have already been sustained by the equitable plaintiffs and for pecuniary losses which they may probably suffer in the future as the result of the death. No damages shall be awarded as a solace for the grief or mental suffering of relatives of the deceased. Baltimore & Ohio R. Co. v. State, to Use of Mahone, 63 Md. 135, 146; United Railways & Electric Co. of Baltimore v. State, to Use of Mantik, 127 Md. 197, 205, 96 A. 261. In the case of the children of a person killed by negligence, the jury may estimate the prospective damages up to the time of their marriage or majority. The children may recover for the loss of the comforts, education, and position in society which they would have enjoyed if their father had lived and retained his income and they had continued to form part of his family. Baltimore & Ohio R. Co. v. State, to Use of Hauer, 60 Md. 449, 467." Baltimore Transit Co. v. State for Use of Castranda, 194 Md. 421, 436–437, 71 A.2d 442, 449. See also State to Use of Bowman v. Wooleyhan Transport Co., 192 Md. 686, 65 A.2d 321; State to Use of Mitchell v. Jones, 186 Md. 270, 46 A.2d 623, 47 A.2d 71; Davidson Transfer & Storage Co. v. State, for Use of Brown, 180 Md. 63, 22 A.2d 582.

The husband can recover, in his action for his own personal injuries, damages resulting from shock as a result of the accident and from his fear for the safety of his wife and child as well as for his own safety. Resavage v. Davies, 199 Md. 479, 86 A.2d 879; Bowman v. Williams, 164 Md. 397, 165 A. 182. A similar recovery may be had by the child. And recovery may be had by the wife's administrator for her conscious pain and suffering. Ann.Code of Md., art. 93, sec. 12.

### Conclusion.

A. In the cause of action under art. 67, for the death of Mary S. Gaegler, the damages are $37,000, which should be apportioned $20,000 to the surviving husband, and $17,000 to the surviving son.

B. In the cause of action under art. 93, sec. 12, the administrator is entitled to recover $2,000 for Mrs. Gaegler's conscious pain and suffering, plus $1,000 on account of her funeral expenses, a total of $3,000.

C. Francis X. Gaegler, III, is entitled to recover $2,000 for his personal injuries, including shock and fear. The amounts awarded to the infant for his own injuries and for his share of the damages in the Wrongful Death Action, should be deposited or invested for his benefit by his guardian or deposited to his credit subject to the order of the Orphans' Court for Prince George's County.

D. Francis X. Gaegler, Jr., is entitled to recover: (1) for his own injuries caused by shock and fear, as well as by the impact, including past and future medical expenses and loss of earnings, $7,500; (2) for the medical expenses of his son, past and future, $1,000; (3) for the damages to his automobile, $100 [1]; a total of $8,600.

Let judgment be entered accordingly.

1. This is all that was requested by counsel for plaintiff.