# JOHN H. ZINK

## *vs.*

## STATE OF MARYLAND, FOR THE USE OF HILDA REBECCA RENSTROM, ET AL.

*Negligence: automobiles; collision with pedestrian; when corporation not liable for personal acts of agent; damages; wife's rights; joint lives.*

A certain manufacturing plant was a mile and a half from the terminus of the United Railways of the City of Baltimore; the Company did not provide transportation for its employees to the car line, but a jitney or bus line was used by them for reaching the cars; the General Manager of the Company came to and went from the plant in his own automobile; one afternoon, after working hours, the General Manager was detained in conversation with a visitor, and, seeing one of the men standing around, asked what he wanted, and was told that the "bus" line was not running; then the manager told someone to take the man to the car line in his auto: *Held,* that in giving such direction, the General Manager acted only in his individual capacity, and not as an officer of the Company; and for the death of a foot passenger, who was struck by the automobile in going to the cars for such a purpose, the driver was the personal agent or servant of the General Manager, and not of the Company.                                        pp. 677, 678

Where a wife sues for damages for the death of her husband occasioned by the defendant's negligence, the jury should be instructed that, in estimating her prospective damages, they should take into consideration the probable duration of the joint lives of the husband and wife.            pp. 678, 679

*Decided May 27th, 1918.*

Appeal from the Court of Common Pleas of Baltimore City. (SOPER, C. J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE and CONSTABLE, JJ.

*Lucius Q. C. Lamar* and *William L. Marbury,* for the appellant.

*Lewis W. Lake* and *J. Cookman Boyd,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

August Renstrom, husband and father of the equitable plaintiffs, while walking upon the public highway leading from Wagner's Point to Stone House Cove, in Anne Arundel County, Maryland, on the 24th day of January, 1917, was knocked down and killed by an automobile owned by the defendant and driven by one Upham, who, as the declaration alleges, was at such time the agent of the defendant.

Renstrom at the time of the accident was employed by the Curtis Bay Chemical Company located upon Stone House Cove. He, each day, went to and from his home in Baltimore City to his place of employment, upon the cars of the United Electric Railway Company of Baltimore City, the terminus of which, at Stone House Cove, is about four city blocks from the plant of the Curtis Bay Chemical Company.

Upham, as well as the defendant, was an employee of the United States Asphalt Refining Company, whose plant is located in the vicinity of Stone House Cove, about a mile and one-eight from the terminus of the car line of the Railway Company.

To accommodate the employees of the Asphalt Refining Company and others employed or living in that locality, a public jitney bus line had been established by the City Railway Company, starting at the terminus of the car line and running upon the public macadam road to Wagner's Point.

On the day of the accident the jitney operating upon this line was disabled, and at the hour of five o'clock in the afternoon of that day when the factory of the Asphalt Refining Company shut down, there was no jitney to take its employees to the terminus of the car line, consequently they, with the employees of other companies, were required to walk to the terminus of the car line in order to take the car to their homes in the city.

The defendant, who also lived in Baltimore City, used an automobile owned by him in going to and from the plant each day. The car and jitney lines were not used by him. Upham boarded at the same house with the defendant, in the city, and rode with him each day to and from the plant of the company.

On the occasion of the accident it seems that the defendant was detained at the office of the company after the hour of the shutting down of its plant, and while there in conversation with a visitor, one Schlee, an employee of the company, called at the office, and the defendant asked him "what he was doing there," as it was after office hours. He said, "well, the jitney bus was broken down and he was not able to go home." The defendant then turned to Upham, who was in the office waiting to return to the city with him in his automobile, and said to him, "what are you doing?" Upham replied "nothing," and the defendant then said, "well, take him (Schlee) up to the car line," meaning that he should take him in his, the defendant's automobile, and both Schlee and Upham left his office. On their way to the car line, in the automobile of the defendant, they overtook other employees of the Asphalt Refining Company, who had started to walk to the car line. Three of these, either by invitation, or at their request, got upon the running boards, or upon the rear of the machine, it having but two seats in it. It was while upon the road, on the way to the car line, that Renstrom was knocked down and killed by the automobile driven, as we have said, by Upham.

Howard J. Eyerly, an employee of the Curtis Bay Chemical Company, testified that he, at the time of the accident—

which was about ten minutes after five o'clock in the afternoon of January 24th, 1917, was walking with Renstrom and two other employees of that company upon the public highway on their way to the car line. They were walking four abreast upon the road, he to the extreme left with Renstrom next to him on the right, "and I heard the buzzing of the machine, or some kind of a noise, and it made me turn around, and I just happened to get my head around and I saw this big gray machine, something on the order of a racing car, and a right heavy machine at that, and I hollered 'look out!' That was all I had time to do, was to holler 'look out!' and as I hollered 'look out'! I stepped to the left like, about a foot, and Gus, the man who got hit, stepped one step ahead and just got his head around like this, when the machine came along and caught him. The machine knocked him down head first and knocked him at least ten feet in front of the machine, and then the left front wheel ran over his head again. The machine kept on about two hundred or two hundred and fifty feet, and in the meantime I started to run after the machine, because I thought the fellow was not going to stop, but he stopped * * * and we picked him (Renstrom) up and took him up to Brooklyn." He further testified that he never heard any horn blow, and that the road was straight at this point, and that there was no obstruction in the road, more than a few men who were walking upon it. That when he looked around the automobile was about seventy-five feet behind him and was going, as he judged, about thirty-five miles an hour. "It went by me like a streak of lightning—just missed me." The automobile at that time was on the extreme left side of the road. Renstrom died the next day after being carried to the hospital.

Benjamin Max, one of those present with Renstrom and the witness Eyerly on the occasion of the accident, also testified as to the happening of the accident, but as his testimony was practically the same as that of Eyerly, we need not repeat it here.

Wycliff O. Manger, an employee of the Asphalt Refining Company, who was with Upham in the automobile at the time of the accident, testified that he was sitting in the front of the machine on the floor with his feet out on the step, looking ahead. "We passed different workmen on their way home, blowing the horn every time we passed anyone. I noticed there was a cart in the distance and they started to blow their horn and blew it continuously to let the cart know they wanted to pass it on the left. There were four men walking on the left side of the road, right in front of the cart, as though they were getting out of the way of the cart. He (Upham) blew the horn and started to get over to the left side of the road to pass the cart, expecting the men to hear the horn and step off the road. It seemed they didn't hear the horn and didn't pay any attention to it until we were within, I guess, twenty or thirty feet of them, and they each started to look back over his shoulder and they saw the machine and they scattered. Two went to the right in front of the cart and two went off to the left. One man on the extreme left, he got off the side of the road, but the second man from the left, he was the last one to look back over his shoulder, and didn't get off before we reached him, and the left lamp of the machine struck him in the back and knocked him down alongside of the road. We continued on, slowing down, about fifty feet and came to a stop." He also testified that the car was going about ten or twelve miles an hour. This evidence of Manger is supported by that of Disney and Schlee, but Schlee further testifies that he "was down to the plant and Mr. Upham came to the office with the car. They generally bring it up about five o'clock, and Mr. Zink drives it home. He goes down in it in the morning and goes home in it at night, and Mr. Zink was in the office, and Upham said 'come on, Schlee, I will take you up to the car line,' and the other boys were all along the road and they got in as we went by." He also testified that he, himself, at times had used the car when told to do so by the defendant, but was unable to say that the business for which he used it was for the

company.  He was then asked, what was the nature of the
business?  He answered, different errands.  "Q. What kind
of errands?  A. Well, sometimes he sent me to his house."

The defendant, when placed upon the stand in his own
behalf, testified that he was the manager of the United
States Asphalt Refining Company and had been manager
since 1913.  That the company employed possibly so many
as one hundred and fifty men, the number varying on dif-
ferent days; that the plant was about a mile and one-eighth
from the trolley car line, that the company did not provide
transportation for its employees to and from the trolley line,
but the United Railway and Electric Company operated a
bus line from Stone House Cove to Wagner's Point, upon
which the buses run every twenty minutes.  The witness
also testified as to the conversation which we have already
given, in which he told Upham to take Schlee to the car line.
When he was asked: "Was it within your employment with
the company to provide means for the employees of the com-
pany to get to the car line?" he answered; "I had not any
instructions in the matter whatever.  The man was standing
there and I used the discretion; as to whether it was personal
discretion or not, I did not consider that at the moment.  If
there was anyone else walking along the road and I felt like
picking them up, I would * * *"  Here the witness was in-
terrupted by his counsel asking him "but did you have per-
sonal interest in having Mr. Schlee taken to the trolley car
that night?  He was not in your employ, was he?  A. No,
sir.  Q. Well, was it to your personal interest to have him
sent to the car, and if so, why?  A. I had not any personal
interest other than I considered a favor, that is all.  Q. But
the company had an interest in it, didn't it?  A. I don't
know.  Q. You don't know whether it made any difference
to the company whether the men had transportation or not?
A. Well, they may have or not, but I did not consider that
at the time I told them to take the machine."  He was then
asked, upon cross-examination, "was it part of your duty

to furnish transportation from these works to the car lines?
A. No, sir. Q. Was there anything in the employment of
these men, since you had charge of the employment, that
was a condition to furnish them transportation from the
works to the car line? A. No, sir. Q. Do you know of the
jitney being broken down any other time than this? A. Yes,
sir. Q. And how had the men gotten to and from the works
then? A. Some of them walked and some of them were
picked up on the other machine and taken to their car line.
Q. Was this after office hours? A. Yes, sir."

At the conclusion of all the evidence the plaintiff offered
two prayers, both of which were granted; the defendant
offered six prayers. The third, fifth and sixth were granted;
the first, second and fourth were refused. Exceptions were
taken to the rulings of the Court in granting the plaintiffs'
prayers and in refusing the defendant's said prayers. The
defendant, by his first prayer, asked the Court to instruct
the jury that there was no evidence adduced "legally suffi-
cient to prove that at the time when August Renstrom was
struck by the automobile mentioned in the declaration, said
automobile was being operated by the defendant, John H.
Zink, or his servant or agent, as alleged in the declaration."
It is upon the Court's ruling in rejecting this prayer and
in granting the plaintiffs' prayers, that the defendant chiefly
relies in his efforts to have the judgment for the plaintiffs,
in the Court below, reversed.

It is conceded that the automobile, driven by Upham at
the time of the accident, was the automobile of the defend-
ant; and the undisputed evidence in the case shows that at
such time it was being used by Upham upon the express
direction of the defendant in carrying Schlee to the car line.

These facts show that Upham, at the time of the accident,
was the agent or servant of the defendant, unless, as claimed
by the defendant's counsel, Zink, the defendant, was acting as
manager of the Asphalt Refining Company in giving such
directions.

To have taken the case from the jury under the prayer offered, it would have been necessary for the Court to have held, as a matter of law, that by the undisputed evidence in the case the defendant was acting as the manager of the Asphalt Refining Company, and not personally, in directing Upham to take Schlee to the car line in his automobile.

It was not a condition of their employment that the company should provide its employees transportation from the plant to the car line. The railway company had provided a jitney bus line from its cars to Wagner's Point, and the employees of the Asphalt Refining Company had, at their own expense, availed themselves of such transportation in going to and from their homes to the company's plant.

The bus upon this line upon previous occasions had become disabled, and at such times failed to provide means of transportation for the company's employees and others to and from the car line to the plants at which they worked; and at such times said employees and others walked to and from the car line, unless picked up, as stated by the defendant, by some automobile traveling upon that road.

The plant of the company had shut down for the day and the employees, other than Schlee, had started to the car line, but Schlee, knowing that the defendant was still at the office of the company and thinking he would soon start in his automobile for his home in the city, passing by the terminus of the railway company's car line upon his way to the city, goes to the office of the company, no doubt for the express purpose of riding with him in his automobile as far as the terminus of the car line, and thus avoiding walking that distance.

Upham, at the time, was at the office of the company waiting to return to the city with the defendant in his automobile. The defendant, as we have said, having been detained by a visitor at the office. The defendant, seeing Schlee at the office at a time of day when he ordinarily would have been on his way home, asked him why he was there and when

told by Schlee that the bus was disabled and not running,
the defendant turned to Upham and said "What are you
doing?" Upham replied "nothing" when the defendant said
to him, "Well, take him up to the car line." These facts, in
our opinion, do not show that the direction given by the
defendant to Upham to take Schlee, in his private automo-
bile, to the car line, was given by him as the manager of
the company, but on the contrary show that such direction
was a personal one, which made Upham his personal agent
or servant. The correctness of this conclusion, we think, is
further shown by the evidence of the defendant himself. He
testified, when asked what interest if any he had in Schlee,
that he had none, but regarded his act in sending Schlee to
the station as a personal favor, and in doing so was prompted
by the same feeling that would prompt him in picking up
any other person walking upon the road in like situation, and
from what he further said it can well be gathered that the
company was not at all considered by him in what he did,
in respect thereto, but the act was purely a personal one upon
his part.

The decision here reached, upon the facts of this case, is
not at all inconsistent with the decisions in the cases of
*Broderick* v. *Detroit Union Station and Depot Company,* 22
N. W. 802; *Wilson* v. *Banner Lumber Co.,* 108 La. 590, and
others cited by the appellant; the facts in those cases differ
widely from those in the case before us; nor is the conclusion
we have reached at variance with the principles enunciated
in *Bailey on Personal Injuries,* Vol. 3, page 2005.

The plaintiffs' second prayer is not in full accord with
what this Court, in *Baltimore and Reisterstown Turnpike*
v. *State, Use of Grimes,* 71 Md. 583, said it should be. In
that case this Court, in discussing a prayer like the one
before us, said: "It would be better and safer to say that in
estimating the prospective damages to the widow the jury
were to take into consideration the probable duration of their
joint lives," meaning the joint lives of herself and husband.

The Court, however, said that "although not perhaps as
explicit as it might be, yet fairly interpreted, it means, as
we understand it, that in estimating the *prospective damages*
to the widow, the jury are to take into consideration the
reasonable probabilities *of her life and the life of her hus-
band,* or in other words, "the probable duration of their
joint lives." A reason assigned in that case, why the prayer
should be more explicit, as suggested, was that "in some
cases there may be a great disparity between the ages of the
husband and wife. The husband may be advanced in years,
and in feeble health. And the wife may be in the prime of
life, and in such cases it would not be just to estimate the
pecuniary loss suffered by her in taking into consideration
the *probable duration of her life, irrespective of the prob-
able duration of the life of her husband."* The record in
this case discloses that at the time of the death of the husband
he was 44 years old and in perfect health, while the wife
was at that time 37 years of age. This was not such a
disparity in their ages as to warrant us in holding this
prayer bad because of it, in view of the action of the Court
in the former case from which we have just quoted. As in
that case no objection was made to the instruction because of
such defect, and as there said, we must assume the jury
understood it to mean the joint lives of herself and husband.
*Baltimore & Ohio R. R. Co.* v. *State, Use of Trainor and
others,* 33 Md. 542; *Baltimore & Ohio R. R. Co.* v. *State,
Use of Woodward,* 41 Md. 268; *Cumb. & Penn. R. R. Co.* v.
*State, Use of Hogan,* 45 Md. 234, and *Phila., Wilm. & Balti-
more R. R. Company* v. *State, Use of Bitzer,* 58 Md. 372.

We find no error in the Court's rulings in granting the
plaintiff's prayers, and in our opinion the defendant's second
and fourth prayers were properly refused.

The judgment of the Court below will therefore be affirmed.

*Judgment affirmed, with costs to the appellee.*