Harry **PALY**

v.

**UNITED STATES of America.**

**No. 6587.**

United States District Court
D. Maryland, Civil Division.
Nov. 5, 1954.

Maryland, and had been ordered to act as a military escort for the body of another enlisted man who had recently died at the Station. In order to attend the funeral in Baltimore Stefan was driving from the Base toward Baltimore in his own privately owned automobile. The United States defends the suit on two separate grounds (1) that the accident and resulting injury to the plaintiff was not caused by the negligence of Stefan and (2) in any event the defendant is not liable because Stefan at the time was using his own privately owned automobile without orders to do so. I will discuss these two questions separately.

The principal and controlling facts with respect to the circumstances of the accident can be briefly stated. The collision occurred about 12:10 A.M., on January 6, 1953 on Route 301 about 5 miles south of Upper Marlboro, the County Seat of Prince George's County, Maryland. The weather was clear and the road was dry and the particular place was entirely unlighted. The improved asphalt roadway at that point was 18 feet wide with a gravel shoulder of 3 feet on each side. The plaintiff, a traveling salesman, was driving along in his automobile from New York to his business territory in North Carolina. He had spent the prior day in Elkton, Maryland, about 100 miles away, to have repairs to or replacements of some bearings in his car and had been instructed by the mechanic not to drive the car for the next 50 or 100 miles in excess of 35–40 miles an hour. The maximum speed limit at the place was 50 miles an hour. The collision occurred just a few feet or yards north of a sharp curve to the right for a motorist driving north. The plaintiff was driving south and Stefan was driving north. Both were alone in their respective cars. There were no witnesses to the accident other than the respective drivers. The noise of the crashing cars was heard by some neighbors whose house was about 100 yards to the north. An ambulance was immediately telephoned for and arrived in a few minutes.

Joseph S. Cullins, Jr., Cheverly, Md., Jos. D. Bulman, Sidney M. Goldstein, Washington, D. C., for plaintiff.

George Cochran Doub, U. S. Atty., Herbert F. Murray, Asst. U. S. Atty., Baltimore, Md., for defendant.

CHESNUT, District Judge.

This suit against the Government to recover damages for personal injuries is based on the Federal Tort Claims Act, 28 U.S.C.A., particularly sections 1346, 2671, 2674. The plaintiff, Harry Paly, was seriously injured on a Maryland highway in a collision between his Studebaker passenger automobile and a Dodge passenger automobile driven by David Stefan. The latter was an enlisted member of the United States Naval Forces stationed at the Patuxent River Base in

A County police officer was also summoned and arrived in about 15 minutes. Photographs were immediately taken showing the condition of the roadway and the position of the cars respectively which had not been moved before the arrival of the officer.

The plaintiff testified that he had been driving for several hours at approximately 35 miles an hour pursuant to the advice of the mechanic at Elkton; but that by virtue of head injuries sustained as a result of the collision he had retrograde amnesia and was unable to remember particularly any incidents immediately leading up to the collision. Stefan testified that as he was approaching the right hand curve which was shortly north of the crest of a slight rise or upgrade in the road, he saw first the lights of the southbound plaintiff's car which appeared to him to be coming directly toward him; that he dimmed his lights but, thinking that the plaintiff's car was on the wrong side of the road, and fearing that there was an embankment rising from the gravel road surface on his right, his best choice to avoid a collision was to swing his own car to the left across the white line indicating the center of the road, in an attempt to pass the plaintiff's car on the far side of the southbound lane. It is contended for the defendant that Stefan was confronted with an emergency and that he was justified in intentionally crossing into the wrong lane to avoid the collision. The Maryland statutes, however, explicitly provide that automobiles shall be driven on the right half of the roadway; and in intentionally swinging his car to the left across the middle of the roadway Stefan was clearly violating the Maryland highway traffic statute. Maryland Code of 1951, Art. 66½, § 182 et seq.

There is no sufficient evidence in the case to show that the plaintiff's car was proceeding otherwise than in accordance with the Maryland statute other than Stefan's statement that he thought the plaintiff's car was on the wrong side of the road, and it is quite possible that this thought on his part was caused by the position of the plaintiff's car in approaching the crest of the slight hill and the curve of the road. Much more importantly, however, is the evidence of several disinterested witnesses as to the location of the debris resulting from the collision consisting of dirt, glass particles, rust, etc., and a gouge in the road surface resulting from the collision. All these marks and indications as to the place of collision were definitely on the southbound roadway, that is the plaintiff's proper side of the road. Furthermore the photographs of the position of the cars taken promptly after the accident showed that the plaintiff's car was far to the right on the southbound lane and the car driven by Stefan, while in the northbound lane, was near the center line.

Counsel for the defendant contends that considering the whole evidence in the case it is too slight and uncertain to make a finding that the collision was due solely to the negligence of Stefan. But after much thought about it I have concluded to the contrary. Two facts stand out clearly. One is that the collision did in fact occur in the plaintiff's southbound lane, and the other is that Stefan stated that he did in fact intentionally cross over the white center line from his lane into that of the plaintiff. He stated his justification for thus violating the applicable Maryland statutory law was that he was faced with a sudden emergency and that he had to exercise instantaneously his best judgment to avoid a seemingly otherwise certain collision. After considering carefully his testimony on this point in the light of all the other facts of the case and considering the width and condition of the roadway and the circumstantial evidence of the place of collision and the position of the cars after the collision, I do not find that he was justified in the very unusual action that he took. It presented an issue of fact to be decided by a jury, or the trier of the facts. Consolidated Gas, Electric Light & Power Co. v. O'Neill, 175 Md. 47, 200 A. 359. It may be considered that he acted in good

faith but it was evidently a very hurried and very unwise action. Indeed it was an extremely hazardous thing to do in view of the limited width of the roadway. An examination of the photographs taken at the time will show it was utterly improbable, if not absolutely impossible, for him to have succeeded in avoiding the plaintiff's car by crossing into the southbound lane. And it may also be noted from the evidence that Stefan first noted what he thought was the position of the plaintiff's car in the northbound lane when it was about 150 feet away; but it does not appear that he attempted to stop by vigorously applying his brakes or sounding his horn as a warning signal to the other car. Nor is there any satisfactory evidence other than Stefan's expressed belief as to the position of the plaintiff's car to show that the latter was in fact traveling in whole or in part in the northbound lane. I think the whole evidence shows that if Stefan had complied with the statutory requirement to keep to his right of the road a collision would not have occurred as at the time of the collision the plaintiff's car was on his right side of the road.

The defendant's second ground of defense requires a careful consideration of the applicable law. Before answering the complaint the defendant filed a motion for judgment on the pleadings on the ground that the defendant was not liable as a matter of law for Stefan's negligence, if any. At the time an affidavit was submitted which in substance was to the effect that he was traveling in his own automobile without express order to that effect, but to carry out the order to act as military escort for a deceased member of the Naval Forces. A copy of the order was also filed. In the argument on the motion counsel for the Government stressed the point that Stefan was using his own automobile to drive from Patuxent River Naval Base to Baltimore, a distance of more than a hundred miles, without any order as to his mode of travel and that he determined for himself to use his private automobile although to be reimbursed for his expenses in accordance with general authorized practice in such matters. In overruling the motion without prejudice I filed a short memorandum opinion to the effect that the point of law was not sufficiently clear merely on the papers filed in support of the motion to decide the question at that time, and it was pointed out that probably a hearing of the case at a trial would result in developing the applicable Navy instructions or regulations, customs and practices in relation to the duties of Navy personnel assigned to act as military escort. The evidence in this case has now developed seemingly as fully as possible just what were at the time the applicable Naval instructions or practices upon the subject. They will be stated as briefly as possible.

Lt. Commdr. Martz, stationed at Washington, D. C., is the chief administrative official of the Bureau of Naval Personnel in charge of the naval escort program, the basic statute for which is 34 U.S.C.A. § 923. He explained that the purpose of appointing a naval escort for a deceased member of the Naval Forces was not only as a courtesy or honor to the next of kin but that the person so appointed as a naval escort should have the responsibility for the safe and prompt delivery of the body of the decedent to the next of kin; and that it was also the duty of the escort to attend the funeral if desired by the next of kin. In ordinary course the program is carried out in the following way. When the death of a member of the Naval Forces occurs his next of kin is immediately notified and asked whether a naval escort is desired, and if so, what recommendations, if any, the next of kin desires to make. Upon receiving an affirmative request and recommendation by the next of kin another member of the Naval Forces of equivalent rank to that of the decedent is at once appointed as a naval escort, whose duty it is to accompany the body of the decedent by suitable transportation facilities, dependent upon the residence of the next of kin, and to attend the funeral.

Stefan's orders in the instant case referred specially to the Bureau of Personnel Manual, Art. C–9810, a copy of which has been filed in this case as Defendant's Ex. 3–D. With more particular reference to the mode of travel to be used by the naval escort, Commander Martz referred to travel instructions (see Defendant's Ex. 3–A), which provided in substance that travel orders would be issued in each case and "when government transportation (including government air) is not available, issuing commands will make necessary arrangements as required in current transportation directives, wherein it will be noted travel orders will normally authorize travel by common carrier of passengers by railroad, bus, ship and air, etc.:".

It will be noted that this was in force in January 1953 and did not make any reference to the use of privately owned automobiles by Naval personnel assigned to duty as naval escort. Commander Martz further pointed out, however, that as of June 23, 1953 general travel instructions for Navy personnel (including but not specifically for naval escort) were revised and Bureau of Personnel Instructions 1326.2 provided in section 6, printed page 4 that when deemed in the interest of the United States for the particular purpose to be served, written travel orders could specifically authorize Naval personnel to travel by private automobile; but such an order should never be given merely for personal convenience of the individual (Defendant's Ex. 3–B); but there is no evidence to suggest that the general revision of travel instructions dated June 23, 1953 was in any wise due to or caused by the instant case.[1]

In the instant case the naval escort program at Patuxent River Base, comprising Naval personnel of about 7,000, was in charge of the Medical Department at the Base. Warrant Officer Mitchell of that Department was in charge of the naval escort program. Edward J. Smutniak, stationed at Solomon's Island, Maryland, under the Patuxent River Command, died on January 4, 1953. Warrant Officer Mitchell, acting through his aide, Chief Petty Officer Potts, at once advised the father of Smutniak resident in Baltimore City, of the death of his son and inquired whether it was desired to have some one attend as a naval escort and if so, who was recommended. Smutniak's father promptly telephoned the Chaplain that a naval escort was desired and recommended the appointment of Stefan who was a cousin, also in the Service at the Base. This message was communicated to Warrant Officer Mitchell's office. Mitchell went off duty at 4:30 P.M., leaving the matter in charge of Potts. Stefan had been on duty the night of January 4th but learning of the death of his cousin Smutniak, he had the next day, when on liberty, driven in his own automobile to be with his family thinking that possible information might be desired with respect to the circumstances of Smutniak's death, which was understood to have been a suicide caused by mental impairment. Stefan's liberty from the Service was for the day and he was not required to report to the Base until 8:45 P.M. In the meantime during the day the body of Smutniak had been removed by the locally engaged mortician to his funeral home in Leonardtown, Maryland, a few miles away from the Base, for preparation for burial. In ordinary routine Stefan as naval escort for the body would have proceeded from the Base to Leonardtown and from there would have traveled with the body in the mortician's vehicle to Baltimore; but for some reason not clearly explained in the evidence the mortician proceeded to transport Smutniak's body to Baltimore without waiting for the arrival of the

---

1. In this connection it may be noted that in the case of Jozwiak v. United States, D.C.Ohio, 123 F.Supp. 65, the facts stated show that the government official whose travel was there involved was specifically authorized by his written travel order in 1949 to use his own automobile but to be reimbursed only upon a showing that it was of advantage to the government to do so.

naval escort. Stefan reported back for duty at the Base about 8:30 P.M., and at once met Officer Potts who had learned that the mortician had already left Leonardtown with Smutniak's body. Before Stefan reported Potts had previously telephoned instructions to the personnel office at the Base to issue travel orders to Stefan as the naval escort for Smutniak's body. Knowing that the mortician had previously left for Baltimore, Potts, when he saw Stefan, told him that he, Stefan, had been appointed as the naval escort and that as the mortician was already on his way to Baltimore with Smutniak's body he, Stefan, should "get going" on his way to Baltimore. And that he should go to the personnel office for his written orders. Potts gave Stefan to take to Smutniak's next of kin some comparatively minor personal effects which had belonged to Smutniak, and the things customarily given to a naval escort. Potts knew that Stefan owned an automobile and may have known that Stefan had used it in going to and returning from Baltimore that day; but nothing was said by Potts or Stefan about what means of transportation should be used by Stefan. There was a bus line, however, which ran from the gate of the Naval Station to Baltimore which was available for and could be used by Naval personnel desiring to go to Baltimore. Just what the bus schedule was did not appear. There were also official cars at the Station which could be made available for necessary transportation. Nor was there any evidence that I recall as to the stated time for the funeral in Baltimore and it does not appear that Stefan was informed as to the time for the funeral although there was evidence that it did not in fact occur until January 8th.

The written order for Stefan's assignment is to be found in the record filed with the original motion of the defendant for a dismissal of the complaint. It is dated January 5, 1953, addressed to Stefan assigning him to temporary additional duty with a reference thereon to the Bureau of Personnel Manual, Art.

C–9810 heretofore referred to. In substance the material part of the order detailed Stefan as naval escort for the late Edward J. Smutniak and continued "when directed by proper authority, you will proceed on or about 5 January 1953 and accompany the remains from U. S. Naval Air Station, Patuxent River, Maryland, to Duda Funeral Home, Baltimore, Maryland. In carrying out these orders you will be responsible for the safe delivery of the remains at Baltimore and will attend the funeral and burial services unless contrary to the wishes of the next of kin. Upon completion of the funeral or burial services you will return to this Command. Authorized to travel at own expense subject to reimbursement. Expense of this temporary additional duty is chargeable to Apph. 173002.40, Medical Care, Navy 1953, Program Allot, 30000 O.C. 023 NAA 5023." The duration of Stefan's additional duty was for approximately 3 days and upon completion thereof Stefan was to return to the Base and resume his regular duties. The estimated cost of transportation, $90, per diem $21. The order also provided that the per diem in the execution of these orders is authorized in accordance with U. S. Naval Travel Instructions and Joint Travel Regulations for the Uniformed Services.

Stefan testified that upon leaving Officer Potts he went at once to the office of the Officer of the Day and received the written orders which he glanced at but did not critically or carefully read. It was the first time that he had received such an order but presumably he was not entirely unfamiliar with such orders as he had been working in the Medical Department at the Base for some time past. Stefan made no inquiries about bus transportation to Baltimore as he decided to use his own automobile and about 10:30 in the evening he began his drive to Baltimore, the accident occurring a little after midnight when he had proceeded about 50 miles from the Naval Base. He himself was injured by the collision and was tem-

porarily hospitalized but later returned to active duty.

On these facts the Government contends that there is no liability under the Tort Claims Act because at the time and place of the accident Stefan was not acting within the scope of his employment. Section 1346(b) of 28 U.S.C.A. provides in part that the United States shall be liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omisson of any employee of the Government *while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."* (Italics supplied.) And section 2671 "Definitions" provides in part " 'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, means acting in line of duty." And section 2674 provides in part—"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

■ It is now well settled, at least in this Fourth Circuit, that in determining whether the agent or employee was acting in the line of duty and in the scope of his employment with relation to the United States, we must refer to federal law; but that in determining whether a private individual under like circumstances would incur liability we must refer to the law of the State where the alleged tort occurred. United States v. Eleazer, 4 Cir., 177 F.2d 914, certiorari denied 339 U.S. 903, 70 S.Ct. 517, 94 L. Ed. 1333; United States v. Sharpe, 4 Cir., 189 F.2d 239. In both these cases injuries to third persons occurred while military personnel were driving their own private automobiles for transportation from one official station to another and while temporarily on "leave status".

In both cases the government was held not liable because the employees were under the circumstances not acting within the scope of their employment.

These provisions of the Act plainly state that the United States, in consenting to be sued for damages occasioned by the alleged negligence of its agents or employees, has limited its liability to those cases only in which the facts show that the agent or employee was acting within the scope of his employment at the time, and in the case of military personnel, if also acting in the line of duty, but then only if the liability of an individual employer under like conditions is established by the law of the State where the injury occurred. Otherwise stated, in the instant case the plaintiff must show that Stefan was at the time of the injury acting (1) in the line of duty and (2) in the scope of his employment consistent with the Maryland law.

■ The phrase "scope of employment" is one of legal art which has long been directly associated with the general doctrine of "repondeat superior". The phrase restricts the scope of the liability of the principal or master to cases where a servant is acting within the scope of his employment. And it is another generally accepted rule in this branch of the law that the employee was not acting within the scope of his employment unless at the time and place of the tort the principal or master has a right to control the servant's actions. This has been so fully and clearly explained in the decisions of the Fourth Circuit above cited that it is quite unnecessary here to elaborate the point. Particularly applicable here is a statement of the rule by the late Judge Walter H. Sanborn which is quoted in Judge Parker's opinion in the Eleazer case, 177 F.2d at page 916:

" 'The test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very

instant of the act or neglect. There can be no recovery of a person for the act or omission of his alleged servant under the maxim, "respondeat superior," in the absence of the right and power in the former to command or direct the latter in the performance of the act or omission charged, because in such a case there is no superior to respond.' "

■■ Where the injury results from the use by the employee of a particular instrumentality, as in this case a private automobile, to render the master liable on the principle of respondeat superior it must appear that the use of the instrumentality by the employee was under such conditions that he did not have a free hand in its use but was in that respect also subject to the master's control. This is pointed out particularly in A.L.I. Restatement of Agency at pages 539–549, cited with approval in Judge Parker's opinion on page 916. It is also clearly pointed out in the Eleazer case, supra, that the phrase " 'line of duty' " in the Act as applicable to military and naval personnel does not expand the phrase "scope of employment" as generally understood in the legal doctrine of respondeat superior.

■ In the instant case I think it is clear enough that in going to Baltimore to attend the funeral of Smutniak, Stefan was acting in the line of duty; but the question presented is whether at the time of the accident he was also acting within the scope of his employment under both the federal and the Maryland law. The facts of the particular case are certainly very unusual if not quite unique. None of the government officers in charge of the naval escort program had ever heard of a case in which the person assigned as naval escort had used a private automobile for that purpose. As already stated, except for the fact that the mortician had started for Baltimore without waiting for the naval escort, Stefan would have ridden in the mortician's vehicle carrying the decedent's body. As Stefan did not receive his orders until after the morti-

cian had left with the body it was, of course, impossible for him to perform that portion of the order which required him to proceed with the funeral cortege as escort. The remaining part of his duty covered by the order was to attend the funeral and incidental thereto to discharge that portion of the duties of the naval escort relating to contact with the next of kin at the burial service. The question in this case comes down to this —was Stefan acting in the scope of his employment in driving his privately owned automobile to Baltimore? There was clearly no express authority to do so either written or verbal. The written order stated that he was "authorized to travel at own expense subject to reimbursement". This is not an uncommon provision with respect to travel by federal employees. Its purpose is to provide that the employee will be reimbursed for the expense which he incurs in accordance with federal law at the rate applicable to the particular case. 5 U.S.C.A. § 837.

I find nothing in the instructions for Naval personnel to warrant a conclusion that Stefan was impliedly directed to use his own automobile in this case. The form of instructions issued in June 1953 did specifically provide that travel by privately owned automobile was not authorized unless the written orders so specified. While this latter instruction was not issued until some months after the accident in this case, Commander Martz, in charge of the whole Naval Escort Program said that it had not changed the practice. No instance has been called to my attention in which Naval personnel were directed in their orders to use private automobiles for escort duty; and, as previously stated, Commander Martz had never heard of any case in which the naval escort had in fact used his own automobile.

Nor do I find any federal decision which would support the conclusion that Stefan was acting in the scope of his employment in the use of his private automobile in this case. The question as to the liability of the government for

negligence in the operation of a privately owned automobile by a member of the Military or Naval Forces has arisen and been decided in several Federal decisions. Although I have found no case involving facts similar to the instant one the principle applied in nearly all of them is the same as in the opinion in the Eleazer and Sharpe cases, supra, in this Circuit. Some of the decisions in other Circuits are Rutherford v. United States, D.C.Tenn., 73 F.Supp. 867, affirmed 6 Cir., 168 F.2d 70; Bach v. United States, D.C.N.Y., 92 F.Supp. 715; Jozwiak v. United States, D.C.Ohio, 123 F.Supp. 65. The Sharpe and Eleazer cases in this Circuit also involve the use of privately owned automobiles by military personnel. To the same effect in principle see United States v. Campbell, 5 Cir., 172 F.2d 500, certiorari denied 337 U.S. 957, 69 S.Ct. 1532, 93 L.Ed. 1757, involving a pedestrian collision between Naval personnel and a third person. In all these cases the government was held not liable for the alleged torts of its employees. The only case that I have found in which the government was held liable for the negligent use of a privately owned automobile by its employees is Marquardt v. United States, D.C.Cal., 115 F. Supp. 160, not involving military personnel but relating to travel by an engineer to perform work on a rush military project.

There are a number of Maryland cases involving liability of an employer for the negligent operation by an employee of the latter's privately owned automobile; but I do not find in them any principle of law contrary to or inconsistent with the view of the scope of employment as expressed in the Eleazer and Sharpe cases in this Circuit. The principle that is applied throughout is whether on the particular facts the employee was authorized by the employer, either expressly or impliedly, to use his automobile in the performance of his duties. Where the employee does use his own automobile for his own convenience and without such authority from the employer it is held in effect that

the latter is not liable because under the circumstances he does not have the right to direct and control the employee in the use of the automobile. In some of the cases it is said that in the latter situation the real status of the employee is that of an independent contractor rather than that of a mere servant or employee. In general I think it can properly be said that the principle applied by the Maryland cases is not substantially different from the general law of agency with respect to the doctrine of respondeat superior. The fullest discussion of the law applicable to the particular subject is to be found in Henkelmann v. Metropolitan Life Ins. Co., 180 Md. 591, 26 A.2d 418, and Great Atlantic & Pacific Tea Co. v. Noppenberger, 171 Md. 378, 189 A. 434. In the latter case, 171 Md. at page 392, 189 A. at page 440, reference is made to section 239 of A.L.I. Restatement of Agency which is discussed in Judge Parker's opinion in the Eleazer case. Other Maryland cases dealing with the use by employees of private automobiles are Goldsmith v. Chesebrough, 138 Md. 1, 113 A. 285; Regal Laundry Co. v. A. S. Abell Co., 163 Md. 525, 163 A. 845; Zink v. State, 132 Md. 670, 104 A. 264; Wood v. H. W. Gossard Co., 204 Md. 177, 103 A.2d 130. For a general discussion of the requirement as to scope of employment to hold an employer liable on the doctrine of respondeat superior, not involving a private automobile, see East Coast Freight Lines, Inc., v. Mayor & City Council of Baltimore, 190 Md. 256, 58 A.2d 290, 2 A.L.R.2d 386. In A.L.I. Restatement of Agency (1936) Maryland Annotations, we find in the discussion of section 239 of the Restatement headed "Use of unauthorized instrumentality"—

"The Maryland cases are in accord with the results stated herein in situations where an employee without authorization uses an instrumentality in his master's business and in cases where the servant is authorized to use his own instrumentality in his master's affairs. No cases seem to discuss

the effect of the use of an instrumentality in an employer's business with his authorization but without his assuming any control over its use."

Particularly in point here also is Khoury v. Edison Elec. Illuminating Co., 265 Mass. 236, 164 N.E. 77, 78, 60 A.L.R. 1159, where the factual situation is in principle quite similar to the instant case although dealing with a civil and not a government employee. It was said:

"In order that the relation of master and servant may exist, the employee must be subject to control by the employer, not only as to the result to be accomplished but also as to the means to be used."

This case was cited with approval in the Henkelmann and Noppenberger Maryland cases, supra. To the same effect, and much in point here on principle and somewhat analogous facts is Conversions & Surveys, Inc., v. Roach, 1 Cir., 1953, 204 F.2d 499, opinion by Chief Judge Magruder.

In the instant case there was no evidence that Stefan had ever previously used his own automobile for government business; and there is therefore no suggestion that his use of it in the particular case was induced by prior knowledge, approval or acquiescence of his superior officers. He was directed to travel at his own expense subject to reimbursement at authorized rates but there was no direction to him either written or verbal to use his own automobile. His use of it was perhaps a natural and reasonable one on his own part under the circumstances but it was at his own election to do so and for his convenience at the time. Certainly the government had no right or power to control his manner of driving his own vehicle. If the accident had been caused, not by his unfortunate error of judgment in driving, but by virtue of some mechanical defect in the operation of the steering mechanism it could hardly be thought that the government would be liable therefor as it had no interest in or ownership of the vehicle and no duty of inspection or repair, and so far as we know, no official knowledge even that Stefan owned an automobile, which apparently he used from time to time at his own convenience when off duty. Its use by him at the time was for his own convenience in going to Baltimore to comply with that part of his orders to attend the funeral services. He could have elected to travel by common carrier bus line or could have requested transportation in an official car from the Naval Station to Baltimore. While different in degree I think the situation is not different in principle from that of travel by a clerk of the court who is required to attend a session of court at a place distant from his official office, in which case, as stated in Judge Parker's opinion in the Eleazer case, the United States would not have been liable for the negligent operation of his automobile on the way. Similar situations in principle would seem to arise where other government officials such as Judges, United States Attorneys and others are required to attend for the performance of official duties at points distant from their official residence, in which case, as is generally known, they are at liberty if they personally prefer, to use private automobiles and to be compensated therefor at the proper applicable rates under federal law. While the Eleazer and Sharpe cases in this Circuit differ on the factual situations particularly in that government officials respectively were on leave of absence at the time, although generally pursuing a route to a long distant destination pursuant to orders, I feel constrained to hold that the principle that is applied in these cases is likewise applicable here and for that reason the complaint must be dismissed.

Having reached this conclusion, it is of course unnecessary to consider what would be the amount of compensatory damages to the plaintiff for the injuries that he sustained. But as the evidence has been very fully presented on both

sides it is possible that a finding on that point might be useful and save time and expense of a new trial of the case in the event of disagreement by the Appellate Court with the conclusions here reached, if an appeal should be taken. I followed a somewhat similar course in the case of Jefferson v. United States, D.C., 77 F.Supp. 706, affirmed 4 Cir., 178 F.2d 518, affirmed 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152.

The plaintiff was severely injured by the collision. He had a fracture of the skull, a comminuted fracture of the kneecap, a broken arm, a dislocated hip, a broken cervical vertebrae and a partial paralysis of the sixth cranial nerve causing double vision. He was hospitalized with many separate surgical operations over a period of more than a year. He was forced to wear casts on his body for many months. He sustained numerous bruises and lacerations some of which have left scars. But by virtue of very skillful surgery he has had a remarkably successful recovery and an avoidance of any permanent major disability. His hospital and doctors' expenses, or so-called out of pocket expenses, amounted to $5,213. His automobile valued at about $1800 was totally destroyed. However, his counsel states that he was reimbursed for this loss except to the extent of $50 by an insurance company which, however, has not joined in this suit, and is not represented by the plaintiff's attorney who has expressed the preference that that item should not be included in the damages.

The plaintiff's age at the time of the accident was 25 years. He had had a high school and partial college education but since leaving college his average annual net income from earnings had not exceeded about $1,000. For some months before the time of the accident he had been employed as a traveling salesman with a small salary and over-all commission for supervision of other salesmen. His net income for about 8 months of the year, however, as shown by his income tax returns did not amount to more than a few hundred dollars. He had prospects, however, of greater profits later. At the present time he is employed as a clerk in an insurance office at a salary of $65 a week, which is more than his earnings in any prior year. At the trial of the case he appeared to be in normal health and physical ability and of more than average intelligence. He is apparently able without difficulty to read, walk and pursue ordinary activities not involving unusual effort or strain. As a result of his very remarkably successful surgical treatment his present physical disability consists of 15% to 20% limitation of the motion of the neck; 10% to 15% limitation in the use of the left hip; 20% to 25% limitation in the right kneecap. His broken arm healed normally and he has no present disability to the lumbar region of the spine. He still has some double vision amounting to possibly 25% impairment of the use of the eyes owing to double vision at certain angles which, it is said, could be largely corrected by a not too dangerous and not very expensive operation in shortening one of the muscles controlling the rotation of the eyes. He is able to read without difficulty and perform clerical duties. He lost 16 months of gainful activity and suffered long and severe pain and discomfort from his injuries. His life expectancy at 25 was 43 years. Considering all these factors I reach the conclusion that if the defendant were liable the amount of a reasonably compensatory verdict would be $35,000.

For the reasons stated it is Ordered this 5th day of November, 1954, by the United States District Court for the District of Maryland that the complaint in this case be and the same is hereby dismissed.