Frank **MANDERACCHI**, surviving husband, and Dominick J. Manderacchi and Pauline A. Manderacchi, surviving minor children of Angeline Manderacchi, deceased, Frank Manderacchi, administrator of the Estate of Angeline Manderacchi, deceased, Frank Manderacchi, in his own right, and Pauline A. Manderacchi, a minor, by Frank Manderacchi, her father and next friend, in her own right

v.

**UNITED STATES of America.**

Civ. No. 13938.

United States District Court
D. Maryland.

Feb. 27, 1967.

Paul Berman and Bayard Z. Hochberg, Baltimore, Md., and James R. Caiola, Norristown, Pa., for plaintiffs.

Thomas J. Kenney, U. S. Atty., and Fred K. Grant, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C.A. § 2671 et seq., arising out of a collision between the Manderacchi automobile and an automobile owned and operated by Louis J. Ferroni, a chief petty officer in the Navy, at about 12:45 a. m. on Friday, September 8, 1961, on U.S. Route 301, a mile or two south of Upper Marlboro, Maryland. The parties have agreed that before hearing any evidence on the issues of negligence and damages, the Court shall first decide the issue of agency—whether under the circumstances the United States would be responsible for the alleged negligence of Ferroni. That issue has been submitted to the Court on depositions, answers to interrogatories and various exhibits, from which the Court finds the following facts.

In February 1961 Ferroni was a career serviceman, stationed at the U. S. Naval Communications Station, which is located in the southern part of Prince George's County, about 4 miles north of the point where Maryland Route 5 intersects Route 301 to form a huge Y. Route 5, one branch of the Y, runs some 20 miles northwesterly to the edge of Washington. Route 301, the other branch and the stem of the Y, runs northeasterly toward Baltimore and Annapolis and southerly through Charles County to the Potomac River Bridge.

On September 6 Ferroni had been assigned a new job, to edit "The Antenna", a weekly paper published at the Station. It was usually run off each Thursday afternoon on the Station's multilith machine, but publication was sometimes held over until Friday morning. On the afternoon of September 6 and the morning of September 7 Ferroni discussed with a superior officer means of making the paper more interesting, and decided, with his approval, to go to Washington to gather news at the Anacostia Naval Air Station about the all-Navy softball finals, and to investigate the possible use of a smaller-print typewriter.

Government-owned transportation was available for the trip, but Ferroni elected to use his own car. His superior officer knew that Ferroni was going to use his own car and did not forbid its use, but he did not authorize or direct its use, and Ferroni was not entitled to mileage or other reimbursement from the government.

About 10:00 a. m. on that day, Thursday, September 7, Ferroni left the Station, driving about 1½ miles north on Dangerfield Road to Woodyard Road (Md. Route 223), on which he drove about one mile west to Route 5, and then followed Route 5 to Suitland Parkway, at the edge of Washington. Ferroni stayed at the Anacostia Air Station until noon, drove his car to lunch, returned to Anacostia, telephoned to a clerk at his own Station shortly before 3:00 p. m. and told the clerk to save a spot of 10 or 15 lines for an article he would have ready by 9:00 a. m. the next day. At that time Ferroni expected to write the article when he returned to the Station that evening, but he knew that he would also have time to write it the next morning before 9:00 o'clock. At 4:00 p. m. Ferroni left Anacostia and went to a Sears Roebuck store to check on the cost of different lettering, and left the Sears store about 4:45 p. m. When at the Station, "liberty" started for Ferroni each day at 4:30 p. m. and he felt and the Court finds that on this day his liberty started no later than 5:00 p. m. He had no assigned duty at the Station before 7:45 the next morning.

He went to dinner and a movie in the shopping center where the Sears store was located. The movie let out between 10:00 and 10:30 p. m., and Ferroni started back down Route 5. At that time he may have still expected to write the story that night, but when he reached Route 223, leading to the Station, he did not turn into that road, but continued some ten miles south on Route 5 and Route 301 to Waldorf, across the Charles County line. Ferroni went to the Wigwam Restaurant at about 11:00 p. m., where he admits having had two drinks, then on to the 301 Ranch, where he says he had a glass of beer and remained for about

an hour playing the slot machines. It was then past midnight, and Ferroni was undoubtedly quite drunk.

Leaving the 301 Ranch at about 12:15 a. m., he drove north on Route 301, but instead of bearing left on Route 5 at the fork, the normal route back to the Station, he bore right on Route 301. He has attempted to reconstruct his actions, saying that he intended to drive six miles or so northeast on Route 301 to the unpaved, bituminous-surfaced Rosaryville Road, thence northwest on that road to the Woodyard Road and southwest on that road to the Dangerfield Road leading into the Station. His claimed intention to circle the Station in this way is not very plausible, but whatever Ferroni's muddled intentions may have been, he did not follow that course. After driving a couple of miles in the northbound lane of Route 301 he came to a stretch where the two lanes are rather widely separated. He turned left, probably into Missouri Avenue, a grandiose name for a secondary road, and then right, driving north in the southbound lane of Route 301. He continued that course for eight or ten miles, six or eight miles toward Baltimore beyond the Rosaryville Road, until he collided with the Manderacchi car a mile or two south of Upper Marlboro.

The issue whether the government should be held liable for Ferroni's negligence has two aspects: (1) whether, apart from any question of deviation or departure, the respondeat superior rule is applicable to the facts of this case; and (2) assuming that the respondeat superior rule would have applied during the trip to and from Washington, whether the visit to Waldorf and Ferroni's adventures there and thereafter amounted to such a departure from the course of his employment as would prevent the application of the respondeat superior rule.

Williams v. United States, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955), requires the federal courts, in suits under the Tort Claims Act, to apply the law of agency of the place of the accident to determine whether a government employee is acting in the scope of his employment. See Cooner v. United States, 4 Cir., 276 F.2d 220, 223 (1960); Witt v. United States, 9 Cir., 319 F.2d 704, 100 A.L.R.2d 1337 (1963). The majority opinion in *Cooner* noted, however, that "there can never be state cases exactly in point as to the factual situations involved. Thus, while in cases arising since Williams the courts have attempted to find light in decisions of the state courts where the accidents happened, they have also felt it necessary to look to general agency principles". Fortunately, in the instant case there is little if any difference between the rules which have been laid down by the Maryland Court of Appeals and the general agency principles which have been applied by the Fourth Circuit.

In Paly v. United States, D.Md., 125 F.Supp. 798 (1954), *affirmed per curiam*, 4 Cir., 221 F.2d 958 (1955), a stronger case for the plaintiff than the case at bar, Judge Chesnut, after citing and discussing United States v. Eleazer, 4 Cir., 177 F.2d 914 (1949), and United States v. Sharpe, 4 Cir., 189 F.2d 239 (1951), said:

"There are a number of Maryland cases involving liability of an employer for the negligent operation by an employee of the latter's privately owned automobile; but I do not find in them any principle of law contrary to or inconsistent with the view of the scope of employment as expressed in the Eleazer and Sharpe cases in this Circuit. The principle that is applied throughout is whether on the particular facts the employee was authorized by the employer, either expressly or impliedly, to use his automobile in the performance of his duties. Where the employee does use his own automobile for his own convenience and without such authority from the employer it is held in effect that the latter is not liable because under the circumstances he does not have the right to direct and control the employee in the use of the automobile. In some of the cases it is said that in the latter situation the real status of the employee is that of

an independent contractor rather than that of a mere servant or employee. In general I think it can properly be said that the principle applied by the Maryland cases is not substantially different from the general law of agency with respect to the doctrine of respondeat superior. The fullest discussion of the law applicable to the particular subject is to be found in Henkelmann v. Metropolitan Life Ins. Co., 180 Md. 591, 26 A.2d 418, and Great Atlantic & Pacific Tea Co. v. Noppenberger, 171 Md. 378, 189 A. 434. In the latter case, 171 Md. at page 392, 189 A. at page 440, reference is made to section 239 of A.L.I. Restatement of Agency which is discussed in Judge Parker's opinion in the Eleazer case." 125 F.Supp. at 806.

On the same point Judge Chesnut added:

" * * * Particularly in point here also is Khoury v. Edison Elec. Illuminating Co., 265 Mass. 236, 164 N.E. 77, 78, 60 A.L.R. 1159, where the factual situation is in principle quite similar to the instant case although dealing with a civil and not a government employee. It was said:

'In order that the relation of master and servant may exist, the employee must be subject to control by the employer, not only as to the result to be accomplished but also as to the means to be used.'

"This case was cited with approval in the Henkelmann and Noppenberger Maryland cases, supra. To the same effect, and much in point here on principle and somewhat analogous facts is Conversions & Surveys, Inc. v. Roach, 1 Cir., 1953, 204 F.2d 499, opinion by Chief Judge Magruder." 125 F.Supp. at 807.

There has been no significant change in the Maryland law since Judge Chesnut's opinion in *Paly* was affirmed by the Fourth Circuit.

In *Cooner,* supra, the Fourth Circuit applied New York law to allow recovery in a case involving an officer who was going from one duty station to another, using his own car, with a tight time schedule allowing "no leeway for 'a frolic of his own' ". The majority opinion contrasted the New York law with the Maryland law, and emphasized the facts in *Cooner* which distinguish it from the case now under consideration. In this case Ferroni was clearly on "liberty" status after 5:00 p. m. The government had not authorized or directed him to use his own car, was not reimbursing him for its use, and exercised no control over the route he followed or the way he drove his automobile. Applying the principles laid down in the Maryland and the Fourth Circuit decisions, this Court would probably be required to deny recovery against the United States in this case, even if the accident had happened on the return trip from Washington to the Station. Here, however, the additional element of Ferroni's excursion to Waldorf to visit the Wigwam Restaurant and then to the 301 Ranch constituted "a frolic of his own" and such a departure from the return journey to the Station and from what might otherwise be considered the course of his employment as to destroy any possible right of recovery against the government under the respondeat superior principle.

The Maryland law on this point is clear. The leading case is National Trucking & Storage, Inc. v. Durkin, 183 Md. 584, 39 A.2d 687 (1944), where the defendant's driver, Greer, was told in Washington at 7:00 a. m. to take a trailer to Baltimore, load sugar and return to Washington. After loading, he met another driver at Pier 3, Light Street, who had previously unhitched his tractor. They drove the tractor to lunch ten blocks away, and then both were tattooed. While returning to Pier 3 they became lost, and at the time of the accident were headed away from the Pier. The Court of Appeals said:

" * * * We think the evidence clearly shows a departure from the master's business when the loads were left at Light Street and the employees took the tractor for the purpose of pro-

curing a meal and other entertainment in Baltimore, in disregard of their instructions to return to Washington. This is not a case of deviation from route, or a case where the employee was serving the purposes of his master as well as his own. It is immaterial whether the use of the tractor was authorized or not, and the bare fact of return toward the point of departure, after a personal use by the employee, does not alone constitute resumption of the employer's service; * * *.

"If the facts show a departure from the master's business, the chain of liability is severed, but if the facts show a mere deviation in the servant's interest, liability still may attach, and the question is one for the jury." 183 Md. at 589, 39 A.2d at 689.

See also Fletcher v. Meredith, 148 Md. 580, 129 A. 795, 45 A.L.R. 474 (1925); Phipps v. Milligan, 174 Md. 438, 199 A. 498 (1938); State, Use of Shipley v. Walker, 230 Md. 133, 186 A.2d 472 (1962). Cf. McDowell, Pyle & Co. v. Magazine Service, Inc., 164 Md. 170, 164 A. 148 (1933), and Fowser Fast Freight v. Simmont, 196 Md. 584, 78 A.2d 178 (1951).

In the instant case, by the time Ferroni had passed the road leading back to the Station on his return from Washington, and had continued on the road to Waldorf, he was involved in a trip which was entirely his own. National Trucking & Storage, Inc. v. Durkin, supra; A. S. Abell Co. v. Sopher, 179 Md. 687, 22 A.2d 462 (1941). His purpose at that time was not to further any interest of the government. He was not mixing his own and his employer's business. Cf. McDowell, Pyle & Co. v. Magazine Service, Inc., supra; Jordan Stabler Co. of Baltimore City v. Tankersly, 146 Md. 454, 126 A. 65 (1924); United States v. Kennedy, 9 Cir., 230 F.2d 674 (1956). Nor was it a trip incident to his employer's business. Cf. Scott v. James Gibbons Co., 192 Md. 319, 64 A.2d 117 (1949). Ferroni was on leave status and had no duty until 7:45 the next morning. His activities in Waldorf were in no way connected with his employment or his initial trip, in nature, time, or geography. The Court finds that his alleged attempt to return to the Station did not amount to a return to his course of employment. He was still on leave status. Even if the Court could accept his testimony that he was experimenting with a new route, "* * * the bare fact of a return toward the point of departure, after a personal use by the employee, does not alone constitute resumption of the employer's service." National Trucking & Storage, Inc. v. Durkin, supra, 183 Md. p. 590, 39 A.2d p. 689. At the time of the accident he was not driving toward the Station by the roundabout route he later rationalized or by any other route, but was driving away from the Station toward Baltimore or Annapolis.

From all the evidence, the Court concludes that Ferroni was not in the course of his employment at the time of the accident and that the respondeat superior principle as recognized by the Maryland Court of Appeals and by the Fourth Circuit does not apply to make the government liable in this case.